RAMSEY and another, Respondents, vs. HOLMES ELECTRIC
PROTECTIVE COMPANY, Appellant.

*April 15 — May 2, 1893.*

*Contracts: Damages: Prospective profits: Evidence.*

1. Defendant agreed to solicit orders for the use of its electric protective system and to furnish all appliances necessary to put it in operation in connection with such offices of plaintiffs as might be thereafter designated; plaintiffs agreeing to maintain the apparatus and serve defendant's customers in accordance with its contract with them, and to receive as compensation one half of the rentals. The agreement was for three years, plaintiffs having the right at the end of that time to have it extended five years longer. Plaintiffs' office at the time was in the offices of a telegraph company, and they had a mere license to keep defendant's apparatus therein. After defendant had obtained several customers such license was revoked. Defendant thereupon removed the apparatus, and took the business from plaintiffs and gave it to a telephone company. No other offices of plaintiffs in which to put the apparatus had been designated. Upon these facts, *it seems* that it was plaintiffs' duty to provide a new office, but that defendant was at fault if, without giving them notice and a reasonable opportunity to do so, it withdrew from the contract and made a new contract with the telephone company; and that for such breach of the contract plaintiffs might recover damages to the extent that profits had or might have been realized on defendant's contracts with customers previously secured. [Whether damages could be recovered for loss of profits on contracts with customers afterwards secured, *quære*.]

2. The measure of plaintiffs' damages would not in any event be one half of the gross rentals, but only what would remain after deducting the cost and expense of performing the contract on their part; and evidence as to such cost was improperly excluded.

3. Unless plaintiffs had exercised their option to have the contract continued beyond the three years, there could be no recovery for loss of profits which might have been realized after that time.

4. It was error to admit on behalf of plaintiffs a letter written to them by defendant's manager after the action was commenced, proposing to make a new contract with them on more favorable terms, and stating that he felt sure that they could make it a success and that

he was sorry it had ever been taken out of their hands. It was not within the scope of the manager's authority to make such statements in respect to past transactions of defendant with which he had no present concern.

APPEAL from the Superior Court of *Milwaukee* County. The plaintiffs, *Ramsey* and *McGuckin*, partners under the name and style of the Milwaukee District Telegraph Company, brought their action against the *Holmes Electric Protective Company* to recover damages for the breach of a contract made between the parties, by which the latter company agreed to solicit orders for the use of its protective system, furnish all apparatus and materials pertaining thereto, right of way for wires excepted, and the labor necessary to put it in effective operation in connection with such offices of the plaintiffs as might thereafter be designated by the parties to the contract, and the plaintiffs agreed to maintain said apparatus, connections, and appliances in good order, serve the users thereof promptly and properly, in accordance with the contract between the company defendant and its customers (a copy of which was annexed to the contract between the parties), and collect the rentals and keep the accounts incident to the conduct of such business, and pay over to the company defendant one half of the gross sum that might be derived from said rentals monthly, and accept the other half of the rentals as full compensation for their services. All contracts were to be made in the name of the company defendant, and the entire plant pertaining to the service was to continue to be its property, and the plaintiffs were to grant it the right of way for its wires as it might be required on such fixtures, or otherwise, as were or might be controlled by the plaintiffs, provided the use of such fixtures should not interfere with the business of the plaintiffs. The agreement was to remain in force for the term of three years from May 15, 1886, at the expiration of which the plaintiffs were to have

Ramsey and another vs. Holmes Electric Protective Co.

the privilege of a further continuance of five years, and thereafter until ninety days' notice in writing by either party to the other of its desire to discontinue the same; and the agreement was not to be transferable without the consent of both parties.   The plaintiffs alleged that they entered upon their employment September 3, 1886, and discharged all its duties until October 3, 1886, when the company defendant refused, and still refuses, to allow them to perform all the conditions of the agreement on their part, although they were, ever since have been, and still are, ready and willing to do so.   The defendants answered, putting these matters in issue.

At the trial, evidence was given tending to show what amounts had been paid by the customers of the defendant company for its protective service, which payments had been in the main made to the Wisconsin Telephone Company, which had its office in the same building as the Western Union Telegraph Company.   One McLeod, as a witness for the plaintiff, testified, in substance, that the Wisconsin Telephone Company operated the defendant's system for it from October, 1886, to December, 1887, and, against the objection of defendant, was allowed to testify that the gross receipts for one year of that time were $1,321.30; that the expense of operating it might have been $10 a month.   He did not include in this, care, risk, and responsibility independent of any cash disbursements, and said he did not know how to calculate that factor in the question, and, being asked to give his best judgment, the court directed him not to answer.   He was asked if it would be something, and the court refused to permit him to answer.   He was asked what, in his opinion, would be the expense of caring for the electrical galvanometer mentioned in the contract, but the witness was not allowed to answer.   Evidence was given to show other gross receipts by the defendant from its customers down to March, 1892.

One of the plaintiffs testified, in substance, that they started to perform the contract, and got the apparatus, etc., in working order in their office at 89 Michigan street, in the offices of the Western Union Telegraph Company; that a Mr. Roome, on behalf of the defendant, came into the office in September, 1886, and said he had orders from it to take the apparatus out; that the president had made a new contract with the Wisconsin Telephone Company; and they took the apparatus to the Wisconsin Telephone Company; that the plaintiffs were anxious, ready, and willing to go on with their part of the contract at the time they did this; that they forbade the plaintiffs going on with their work; that the defendant offered them the contract in 1890 under the same arrangements under which it is carried on now by Mr. Weller; that they did not take it, because Mr. Weller would not allow them to take it. "He put us out of the office."

Considerable testimony was given on the subject of the right of the plaintiffs to keep said apparatus in the office of the Western Union Telegraph Company, and it appeared, in substance, that in the first instance they had permission of the officers of that company to keep it there, but it was subsequently, and before the apparatus was taken out, revoked. They had a mere license, and the plaintiffs were under contract with the said telegraph company to deliver, day and night, including Sundays and holidays, with diligence, etc., all telegraphic messages received by that company at the main office, or such other places as it might elect, in the city of Milwaukee, and turned over to them for that purpose; plaintiffs agreeing to continue to furnish and pay the salary of a clerk in the telegraph company's main office, who should receive messages through the telephone in said office over the telegraph company's lines. The provisions of these agreements were to be in force from the 1st of April, 1884, thereafter, until after written

Ramsey and another vs. Holmes Electric Protective Co.

notice had been given by one of the parties thereto of its intention to terminate the same. They ceased to work in the office of the telegraph company in December, 1887. One of the plaintiffs testified that no other place than the Western Union Telegraph Company was ever designated by the plaintiffs to the defendant as a place to carry on this business; that the business did not necessarily require a night watchman, but a night clerk, there; that it required some one to watch the instrument in the night time, and also some one to look after the lines; that before then there had never been any business of this kind carried on in the city. He identified the letter said to be a proposal for again employing them, dated November 22, 1888, signed by H. C. Roome, general manager of the defendant, addressed to the plaintiffs. It was offered in evidence on behalf of the plaintiffs, and is as follows: "Gentlemen: We are thinking of removing our system of protection from the Wisconsin Telephone Company. Will you take it under the same terms as they have it? The terms are the same as in your contract; that is, with the exception you are to receive sixty per cent. of the rental instead of fifty per cent., and to furnish lines, instead of us. Have you any means of crossing the Milwaukee river other than that of the Western Union cable? I understood from you, when I was there, that the wires in that cable were all in use. I am sure, if you take hold of it, you can make it a success, and, as you are aware, I am very sorry that it was ever taken out of your hands. An early reply will oblige. Yours," etc. The plaintiff *Ramsey* testified that it would be necessary to have some one to look after the lines in order to carry out the contract; that it required some one to be there to receive the signals as they came in. No evidence was given to show that the plaintiffs ever elected to extend said contract beyond the three years term specified in it. The testimony showed that the defendant had but two contracts when the business was commenced.

Ramsey and another vs. Holmes Electric Protective Co.

On behalf of the defendant, evidence was given to show that the defendant did not make, or attempt to make, any arrangement with the telephone company for transacting its business until after they were required to get the apparatus out of the office of the Western Union Telegraph Company, and that previous to that time no arrangement had been made with any other person for any office in which to set up the apparatus and carry on the business; that, on the 8th of September, plaintiffs told the defendant's general manager that the Western Union Telegraph Company refused them permission to use its offices and poles for the apparatus and wires necessary in their business; that he went immediately to Chicago to see Mr. Tubbs, the superintendent, and Gen. Stager, his superior officer, to obtain permission, and each of them refused to give it; that he afterwards saw one of the plaintiffs, *McGuckin*, and "explained to him the result of that interview, and requested him to allow me to take out the apparatus which belonged" to the defendant. Mr. Tubbs, the superintendent of the Western Union Telegraph Company, testified that he had ordered the machinery to be taken out of the office of that company, and directed that it be not permitted in the office. In 1886, plaintiffs were in the employ of the Western Union Telegraph Company. *McGuckin* was delivery clerk, and *Ramsey* was receiver of messages from the public at the counter, and cashier, and they had no office in the city of Milwaukee. The defendant offered to show, at the time the instrument was put in there, that there had not been any established business in the city of Milwaukee by the defendant, or any other company, of a protective system of this kind; that the *Holmes Company* had no such business in the city prior to that time; and that this system of protection, as testified to by the plaintiffs, in 1886 was an entirely new business in the city. These several tenders of proof were objected to by the

plaintiffs, and the objections were sustained; but proof was allowed to show that the plaintiffs had no established business of the same kind or nature in the city of Milwaukee.

Mr. Weller, a witness for the defendant, who testified that he was familiar with the business, was asked, "What, under such a contract as has been offered here in evidence between the plaintiffs and defendant, are the legitimate expenses of carrying on that business?" but objection thereto was sustained. In like manner it offered to show that it would be necessary to employ an electrician to care for the galvanometer. The defendant also offered to prove by Mr. Weller, who, it appeared, was familiar with the cost and method of operating such business, what would be a reasonable sum to be allowed for the care of the instrument or galvanometer; also whether it would be necessary to employ the line man and night watchman to take care of the instrument, and if he knew what would be the reasonable and legitimate expense of conducting the business under this contract between the plaintiffs and the defendant. These several offers were objected to, and the objections sustained.

The plaintiff *McGuckin*, being recalled, presented a computation, stating that their share of the amount which would have been earned under these contracts from the 15th of May, 1886, to the 4th of August, 1888, when the suit was commenced, was $765.25; and that the amount that would have been earned from the 15th of May, 1886, to the 15th of May, 1890, would be $2,092.50, and their proportion would be $1,046.25; that the gross amount up to May 9, 1892, was $4,221, and that their share would be $2,110.50. All of this proof was allowed, against the defendant's objection.

The court instructed the jury that, under the provision of the contract that "such offices may be designated by the parties hereto," the contract implies that either of these

parties had the right to designate where this business should be carried on, and, if the plaintiffs failed to secure the right to remain in the Western Union Telegraph Company's office, then it was incumbent upon the plaintiffs and the defendant both to designate an office where the business should be carried on and the apparatus located; that, if the plaintiffs failed to do so, then it was the duty of the defendant to designate the office, and, if it failed to do so, then it was no excuse for its breaking the contract, and letting the contract to other parties, and taking it away from the plaintiffs; that, if the plaintiffs kept and performed the contract, or were ready and willing and able to do so, the contract, so far as they were concerned, existed during the whole term of five years, even though it were broken on the part of the defendant, and the plaintiffs had a right to claim the benefit of all subcontracts that were taken under that contract during its continuance; that the jury were to ascertain from the evidence what profits would have been made by the plaintiffs under these subcontracts if they had been permitted to continue in the business, and that those profits they were to assess from the time of the commencement of the contract during the whole continuation of the term of five years, and that they were to ascertain what those profits were from the evidence.

The court was requested to instruct the jury that they were to determine what would have been the necessary expense in conducting the business in the office of the Western Union Telegraph Company, and, in addition to that, to determine what would be a reasonable allowance, under all the testimony, for the release of the plaintiffs from the care, risk, and trouble in attending to said business, and for the less time engaged by the plaintiffs, and to take into consideration these facts in determining what amount of damages should be assessed against the defend-

ant if the jury found against it. The court refused this instruction, but told the jury that they might take into consideration all these facts in determining what would have been the profits from these contracts.

A verdict was found for the plaintiffs in the sum of $1,545.02. A motion for a new trial was denied, and judgment was given on the verdict for the plaintiffs, from which the defendant appealed.

*Glenway Maxon,* for the appellant.

*Henry L. Buxton,* for the respondents.

PINNEY, J.    1. It is contended on behalf of the appellant that the plaintiffs' claim is based wholly upon the loss of prospective profits, and that the contingencies were so numerous, and the uncertainties so great, that prospective profits could not be allowed as damages; and it rested its defense in this regard upon the ground that the right of the plaintiffs to use the office of the telegraph company for their business was that of mere licensees, and might be terminated at any time, as it was in fact in October, 1886, and that no business such as the one in question had ever been established or carried on in Milwaukee, and the profits that might be made depended largely upon the skill and fidelity of the persons operating the business, and the confidence the public might have in their integrity and ability. If this contention could be sustained, and the defendant violated the contract, the plaintiffs would still be entitled to nominal damages, at least. By the contract the defendant was to solicit and procure the orders and subcontracts of customers, and the plaintiffs were certainly entitled to receive fifty per cent. of the gross sum that might be realized by performing those already secured. To the extent that profits were realized in the execution of these contracts, three in number, damages might and should be awarded to

the plaintiffs; and their claim in this respect rests on a plain and reasonable foundation, and is not fairly subject to the objections of the defendant.

After the revocation of the license to use the office and facilities of the telegraph company where the plaintiffs were employed on salaries as clerks, there was no joint action of the parties in respect to selecting or securing by the plaintiffs a new office and other facilities for carrying out the contract. The evidence does not show that the plaintiffs were ready and willing, or offered, to make any other provision in this respect, but said they would sue the defendant. Probably such failure on their part, after reasonable notice and opportunity to perform, might have been treated as a withdrawal from the contract on their part, and as ground for rescinding it. It does not seem reasonable to hold that the defendant alone was entitled or bound to select and procure another office and other facilities. It was their duty to provide these, but both parties were entitled to be consulted in respect to their character and location. The subject matter of the contract was such that any unreasonable delay would operate as a violation of the defendant's contracts with its customers, who were entitled to prompt and continuous service. On the other hand, the defendant would be in fault if it withdrew from the contract, and entered into another with the telephone company, without notice and reasonable opportunity to the plaintiffs to secure other means or facilities on their part for performing the contract. After the alleged breach of the contract on the part of the defendant, and while operating under its new contract with the telephone company, the defendant secured, prior to the commencement of this action, five other customers and like subcontracts, and still others thereafter, before the expiration of the three years stipulated duration of the contract between the parties, and in performing these contracts the plaintiffs claim, and

have been allowed, damages for the supposed profits made by the telephone company as in some sense a criterion by which the profits which the plaintiffs might have made may be estimated. Whether this claim can be sustained is a question open to considerable doubt, and which we will not now determine, as it was not very fully discussed at the argument. In the case of *Howard v. Stillwell & B. Mfg. Co.* 139 U. S. 199, the subject of prospective profits as damages is fully considered, and many cases on the subject are cited. The evidence shows that the plaintiffs went about other pursuits after their license to use the office and facilities of the telegraph company was terminated, and the evidence upon which to make an assessment of profits was very meager. It is evident that it would have cost the plaintiffs much more to carry out their contract in any other room or place than that where they were then employed on salaries by the telegraph company. The proper measure of damages would not in any event be fifty per cent. of the gross receipts from such contracts. That portion thereof which could be fairly called "profits" would be that which would remain after deducting the cost and expense of performing the contract on their part. These observations in respect to the number of contracts upon which the plaintiffs may recover substantial damages, as well as in respect to the rights and duties of the parties when the license of the plaintiffs to use the office and facilities of the telegraph company was revoked, are made with a view to elicit further discussion upon the new trial in respect thereto, which we grant upon other grounds, and not with a view of concluding the parties.

2. Evidence was tendered to show the fair cost and expense of performing the contract in question in respect to all the subcontracts mentioned, and was excluded. Without resting our conclusion in respect to the ruling of the court upon the examination of Mr. McLeod, we refer to the

offers to prove by Mr. Weller, manager of the telephone
company, who testified that he was familiar with what it
would cost to run the business which plaintiffs had under-
taken.   The court refused to permit him to testify what
were the legitimate expenses of carrying it on, whether it
would be necessary to employ an electrician to care for the
galvanometer, what would be a reasonable amount for the
care of that instrument — whether it would be necessary
to employ a line man and a night watchman, and whether,
under Mr. Weller's management of the business contem-
plated by the contract, there had been any profits.   The
exclusion of the evidence thus offered was error.   If ad-
mitted, it would have had a material bearing on the ques-
tion of what ought to have been allowed as *profits* by way
of damages.   The burden of proving what profits had or
might have been realized was on plaintiffs.   They could
not recover as *profits* the entire half of the *gross receipts*.
The court properly instructed the jury to this effect, but
the defendant was denied the benefit of this ruling by the
exclusion of the evidence offered by it, tending to show
what profits the plaintiffs had really been deprived of.
The plaintiffs had no right to assume that gross receipts
were the measure of profits that were or might have been
gained, and it was their duty to have produced proper evi-
dence on that subject.   A careful examination of the case
fails to show that they offered any evidence on this point at
all, beyond proof of gross receipts.   It is plain that these
rulings are erroneous, and that the plaintiffs failed to pro-
duce evidence justifying so large a recovery.

3. The court left it to the jury to give a verdict not only
as for profits on all the subcontracts mentioned for the
three years during which the contract between these par-
ties was to continue, but for the five years thereafter, dur-
ing which period the plaintiffs had an option to extend the
contract.   There is no proof tending to show that the

plaintiffs ever exercised this option, or elected to make the contract operative beyond its legal term. This mere option as to the five years mentioned was not a contract, but might have been made one by the choice or election of the plaintiffs; and, in the absence of any proof showing that this option was converted into a contract, no recovery can be had for future profits, as damages, which might be realized after the expiration of the three years named in the contract.

4. It was error to permit the plaintiffs to read in evidence the letter written November 22, 1888, after this action was commenced, by Roome, the defendant's general manager, to the plaintiffs, proposing to enter into another contract with them on more favorable terms, and to remove the system from the telephone company, and in which he said: "I am sure that, if you take hold of it, you can *make it a success*, and, as you are aware, I am *very sorry that it was ever taken out of your hands.*" This letter was a written statement made to the plaintiffs, not while he was performing any act for the defendant company, or as a part of any communication which it was his duty to make for the company as its manager. It was not within the scope of his authority to make statements, oral or written, in relation to past transactions of the defendant, and with which it did not appear that he had any present concern. It is easy to understand that this letter may have had a prejudicial effect on the rights of the defendant. That it was improperly admitted is clear. Mechem, Agency, § 539; *Randall v. N. W. Tel. Co.* 54 Wis. 140; *Mil. & M. R. Co. v. Finney*, 10 Wis. 388; *Livesley v. Lasalette*, 28 Wis. 41.

For these reasons the judgment of the superior court must be reversed.

*By the Court.*— The judgment of the superior court of Milwaukee county is reversed, and the cause is remanded to that court for a new trial.