CONSOLIDATED MILLING COMPANY, Appellant, vs. FOGO and others, Respondents.

*September 8 — September 26, 1899.*

*Debtor and creditor: Purchase of goods by insolvent: Fraudulent conveyances: Rescission: Declarations by agent.*

1. A purchaser of goods knew or had reason to believe that he was insolvent but, not being asked in respect thereto, did not disclose the fact to the vendor.   After receiving the goods, and on the same day that he finished placing them in his store building, he gave chattel mortgages thereof to a bank and others.   At the time he

Consolidated Milling Co. vs. Fogo and others.

gave the order he intended to pay for the goods, and he had no thought of giving the mortgages until the goods were in the store and suit had been threatened by another creditor. *Held*, that the sale was complete, without fraud, before the giving of the mortgages, and that the vendor could not rescind it and retake the goods.

2. Statements made to the vendor's agent by the assistant cashier of the mortgagee bank, before the sale, as to the financial standing of the purchaser, which influenced the vendor to fill the order, are *held* not binding on the bank, having been made in a casual conversation and not in the transaction of any business between the bank and such agent.

APPEAL from a judgment of the circuit court for Richland county: GEO. CLEMENTSON, Circuit Judge. *Affirmed.*

*L. H. Bancroft,* for the appellant.

For the respondents there was a brief by *Frank W. Burnham* and *Fruit & Gordon,* and oral argument by *Mr. Burnham* and *Mr. J. J. Fruit.*

CASSODAY, C. J. It appears from the record that April 9, 1898, the plaintiff, a milling corporation of Minneapolis, commenced this action of replevin to recover 500 sacks of flour, of the value of $625, which had been ordered by the defendant *W. F. J. Fogo,* a merchant and dealer in flour at Richland Center, March 28, 1898, and which was received by *Fogo* at his store on April 5, and in the forenoon of April 6, 1898, and which on the afternoon of the same day he mortgaged, with other property, to the defendant the *State Bank of Richland Center,* for $4,969.13, and to the seven other defendants in the aggregate amount of $7,483.64, on the ground that *Fogo* purchased the same knowing himself to be insolvent and with the preconceived purpose of not paying for the same. The defendants severally and separately answered.

A jury having been waived and trial had, the court found, as matters of fact, in effect, that October 26, 1897, *Fogo* ordered of the plaintiff three car loads of flour, to be received

within thirty, sixty, and ninety days, respectively; that one of such car loads was received by him in January, 1898, and paid for prior to March 28, 1898; that the other car loads were not furnished, as the plaintiff, for good reason, decided to cancel the order; that March 28, 1898, *Fogo* directed the plaintiff to forward to him another car load of flour; that he received the same April 5, 1898; that on that day and the forenoon of the following day he took the flour from the car and placed it in his store building; that such flour was the same as was replevied by the plaintiff; that March 28, 1898, and for some time prior thereto, *Fogo* was insolvent; that upon that day his total indebtedness, including liabilities for others, amounted to $12,000, and his total assets did not exceed $9,000; that upon March 28, 1898, he had good reason to believe that he was insolvent, but that at the time he gave the order for the flour he intended to pay for it, and did not contemplate giving the chattel mortgages in evidence or making an assignment; that the plaintiff would not have filled *Fogo's* order of March 28, 1898, but for the fact that the plaintiff's agent, Anderson, had been informed at Platteville by Clark Pease, the assistant cashier of the defendant bank, that *Fogo's* financial standing was all right; that Pease was not at that time aware that *Fogo* was about to make a further purchase of flour, but had reason to believe that what he said would probably influence the action of the plaintiff in its further dealings with *Fogo;* that such conversation took place March 23, 1898; that the plaintiff was induced to fill *Fogo's* order of March 28, 1898, for another car load of flour, by the representations made to Anderson by Pease as to *Fogo's* financial standing, and that such flour would not have been shipped but for such statement; that January 19, 1898, the defendant bank had received, as grantee of *Fogo*, a deed of his store building, worth $5,000, to secure a note which *Fogo* had signed with his brother for $1,000, and also to secure the general in-

debtedness of *Fogo* to the bank; that such deed was not recorded until March 26, 1898, for the obvious reason that the bank did not wish to impair *Fogo's* credit, and so withheld the deed from record as long as it safely could, and only recorded the same when its own safety so required; that the value of the flour was $625; that there was no cause of action against any of the defendants except *Fogo*.

And, as conclusions of law, the court found, in effect, that the plaintiff was not entitled to the possession of the property or any part thereof, nor to a return or delivery thereof, nor to recover the value of the same or any part thereof; that *Fogo* was entitled to a return of such property, or, in case a return could not be had, that *Fogo* have judgment for the value thereof, to wit, $625, together with interest from April 8, 1898, and six cents damages for the taking and withholding of the property; that as the property had been delivered to the plaintiff, and a return thereof had been claimed by *Fogo*, it was ordered that judgment be entered against the plaintiff dismissing this action upon the merits as to all the defendants except *W. F. J. Fogo;* that judgment be entered against the plaintiff for a return of the flour, and, in case a return cannot be had, for $625 damages, being the value thereof; that the defendants and all of them have their costs in this action against the plaintiff, to be taxed. From the judgment entered thereon accordingly the plaintiff appeals.

It is undisputed that *Fogo* got the flour all into his store before noon of April 6, 1898, and that upon the afternoon of that day he gave the chattel mortgage thereon to the defendant bank, and the other chattel mortgages thereon to the other defendants. The pledging of this property to other favorite creditors, almost immediately upon getting possession of it, naturally excites suspicion as to the good faith of the transaction. But the trial judge, who was in a much better position to determine that question than we

.are, has found that at the time of ordering the flour *Fogo* intended to pay for it, and that at that time he did not contemplate the giving of the chattel mortgages, nor the making of an assignment for the benefit of his creditors, as he did immediately after this suit was commenced, April 9, 1898. What occurred after giving the order for the flour, March 28, 1898, to induce him to give the chattel mortgages? He testified to the effect that during the months of February and March, 1898, he had paid bills in the aggregate to the amount of $601.25; that April 6, 1898, one Jenkins, who represented the Hubbard Milling Company, having a claim against him for a car load of flour which had become due a day or two before, appeared at his store and demanded payment; that, when he informed Jenkins that he was not then able to pay, Jenkins insisted that he must either pay or give security, and, when he refused to do so, Jenkins told him that he would resort to legal proceedings; that, shortly after, Pease, representing the defendant bank, came to him and said the bank did not feel safely secured for his indebtedness to the bank, and requested him (*Fogo*) to give a chattel mortgage to the bank, and that, after some talk with Pease, he consented, and gave the mortgage mentioned, and the same was filed at half past 1 o'clock of April 6, 1898; that immediately after the giving of that mortgage the other mortgages mentioned were given and filed; that on the evening of the same day the Hubbard Milling Company commenced an action against him and attached his property; and that he did not contemplate the making of an assignment for the benefit of creditors until a couple of days after the giving of the chattel mortgages, and then only after he had taken legal advice. Such evidence appears to be undisputed. If true, it establishes the facts that *Fogo* not only intended to pay for the flour when he ordered the same of the plaintiff, but that he had no thought of giving a chattel mortgage thereon until after the flour was in his store and

Consolidated Milling Co. vs. Fogo and others.

he was threatened with legal proceedings and an attachment by the Hubbard Milling Company. The trial court having based some of the material findings upon the sole testimony of *W. F. J. Fogo*, we do not feel at liberty to disregard his evidence as to the facts stated.

It is conceded that where a person orders goods, knowing himself to be insolvent, without disclosing his insolvency, and with the preconceived purpose of not paying for them, the purchase is fraudulent, and the vendor, upon discovering the fraud, may rescind the contract and retake the goods, as against the vendee and those having no better right to them. *Lee v. Simmons*, 65 Wis. 526; *David Adler & Sons C. Co. v. Thorp*, 102 Wis. 70, and cases there cited. But it is equally true that the mere omission of a purchaser of goods to disclose his known insolvency to the vendor is not a fraud for which the sale may be avoided. Such mere silence in respect to his pecuniary condition, when no inquiries have been made, is not evidence of fraud. An honest, though abortive, purpose to continue business and pay for the goods is consistent with the vendee's knowledge of his own insolvency. *Id.* We must hold that the sale of the flour to *Fogo* was complete and without any fraud before the giving of either of the mortgages.

It may be that the plaintiff would not have shipped the flour but for the representations made to Anderson by Pease at Platteville, but Pease was not *Fogo's* representative and had no authority to speak for him. It was a mere casual conversation. The defendant bank had no business with Anderson at the time. Pease was not transacting any business for the bank at the time of making the declarations attributed to him. Since he was not, at the time of making such declarations, acting within the scope of his authority as assistant cashier of the bank, it is obvious that he could not bind the bank by such declarations. *Randall v. N. W. Tel. Co.* 54 Wis. 140–144, and cases there cited; *Ram-*

98    SUPREME COURT OF WISCONSIN.    [104

*sey v. Holmes E. P. Co.* 85 Wis. 174, 186; Mechem, Agency, § 714. As to when admissions of such officer or agent are binding, see *Xenia Bank v. Stewart*, 114 U. S. 228, 229.

*By the Court.*— The judgment of the circuit court is affirmed.

*L. H. Bancroft,* for the appellant.

For the respondents there was a brief by *Frank W. Burnham* and *Fruit & Gordon,* and oral argument by *Mr. Burnham* and *Mr. J. J. Fruit.*