De Swarte, Appellant, vs. First National Bank of Wauwatosa and another, Respondents.

*November 17, 1925—January 2, 1926.*

*Fraud: Actionable representations: Statements of fact or opinions: As to character and solvency: Statements made recklessly: Good faith: Reliance by defrauded party: Banks: Fraud of cashier: Scope of employment: Liability of bank.*

1. Representations by the cashier of the defendant bank in advising an investment, from which plaintiff had a right to believe that the bonds to be purchased by him would constitute a second lien on certain valuable lands, were material statements relating to existing facts, on which plaintiff had a right to rely, and hence such representations, if false, are actionable, as are also statements as to the character, solvency, and wealth of the promoters of the company which was to issue the bonds.  p. 462.

2. In an action for losses sustained by acting on such advice, statements not heard by plaintiff, or expressions of opinion or promises that the bonds to be purchased would be taken care of shortly, will not be considered on appeal from a judgment of nonsuit.  p. 463.

3. The fact that the representations were made in October does not prevent plaintiff from relying thereon in a transaction which took place in the succeeding January.  p. 464.

4. False and material representations as to the solvency of a third person, when made recklessly or in culpable ignorance, are actionable if relied on as true, notwithstanding good faith and a belief in the truth of the statements made.  p. 465.

5. Though plaintiff had had previous business experience in buying bonds, where the lands concerned in the investment were in a distant state and it would have been difficult and expensive to obtain knowledge of the bonds relied on as security for loans, and defendant had superior knowledge and better opportunity for ascertaining the facts, plaintiff had a right to rely on the statements made.  p. 466.

6. Where a bank delegates business within its corporate powers to its cashier or other agent, he is the corporation in conducting that business, and if he acts negligently or fraudulently in so doing the corporation may be held liable.  p. 466.

7. The false representations by the cashier as to the solvency of third persons or the value of their securities, made without

express or implied authority and without acquiescence on the part of the directors, are not within the scope of the cashier's employment and do not bind the bank. p. 470.

8. A stockholder in a bank is presumed to have knowledge of the powers and duties properly exercised by the cashier. p. 474.

APPEAL from a judgment of the circuit court for Milwaukee county: JOHN J. GREGORY, Circuit Judge. *Affirmed in part; reversed in part.*

For the appellant there was a brief by *A. J. Schmitz* and *Wolfe & Kolinski,* all of Milwaukee, and oral argument by *Mr. Hubert O. Wolfe* and *Mr. Schmitz.*

For the respondent *First National Bank* there was a brief by *Edgar L. Wood* and *Carl F. Geilfuss,* both of Milwaukee, and oral argument by *Mr. Wood.*

For the respondent *Gates* there was a brief by *Rix, Barney & Kuelthau* of Milwaukee.

JONES, J. This is an action for damages brought against the defendant bank and its cashier for losses incurred by the plaintiff in investments made by him with the advice and counsel of the cashier. The plaintiff, who had been connected with the Bradford Piano Company for many years as employee, stockholder, and, at the time he sold his interest in 1917, as vice-president, had been a depositor in the defendant bank for five years and had sometimes consulted the cashier, *Perez D. Gates,* with respect to investments and purchases of bonds. In the course of these years the plaintiff had come to place confidence in the judgment of this official, and the bank official had become acquainted with the financial standing and business affairs of the plaintiff.

On October 8, 1919, one Bruce Osborne, a stranger to the plaintiff, requested him to come down to the offices of the defendant bank in order that a business proposition might be placed before him. Upon appearing at the bank the plaintiff was shown into the directors' room of the bank by Osborne and another man by the name of Cochran,

and these two gentlemen then stated that they were desirous of obtaining a loan of $10,000 for Osborne & Cochran, Inc., a foreign corporation; that said corporation was financing the Clarke's Fork Land & Cattle Company, which, they said, owned some 5,000 acres of land in western Montana worth about $1,000,000, with a purchase-money mortgage for $150,000 on the land held by Peabody, Houghteling & Company of Chicago; that a new bond issue was being floated which would become a first mortgage upon the land of the company upon the payment of the purchase-money mortgage of $150,000; that the purpose of the loan was to complete certain irrigation projects and for the purchase of cattle. It was proposed that the note of Osborne & Cochran, Inc., be given to the defendant for six months with collateral security in the form of the new bonds of the Clarke's Fork Land & Cattle Company, together with an agreement for a bonus of the Land & Cattle Company bonds.

Upon receiving this proposition the plaintiff stepped over to the cashier's desk, where the defendant *Gates* was seated, and told him of the proposal. The plaintiff testified that *Gates* said he knew about the proposition; that he had investigated and written to a Chicago bank about Osborne and Cochran and that they were "nice boys" and that he knew the president of the Land & Cattle Company also, a Mr. Donlan, who was much like the president of the Wauwatosa bank; that he knew about the value of the land, explaining that the land was of three different classes: irrigated, semi-irrigated, and grazing land. The plaintiff further testified that he informed *Gates* that he wanted the bank's "O. K." upon the proposition of the loan and that he did not want to go into any speculative investment; that if he, *Gates,* would indorse the loan, if the bank would "O. K." it, that he would be willing to loan the money. *Gates,* according to the plaintiff, then said: "I don't see how you can lose, with that security," and said the whole

affair would be cleaned up in three or four. months; that Osborne and Cochran were floating the loan instead of Peabody, Houghteling & Company because Donlan had taken a liking to them; that the bank would sell most of this new issue of bonds and that some would be sold in Minneapolis and Chicago, and that if the loan were made the bank would sell the bonds put up as collateral first and apply the proceeds to the note; that the bank would arrange to obtain the money necessary for the plaintiff to make the loan if the plaintiff did not have the cash on hand to make it. *Gates* showed the plaintiff certain maps and letters with reference to the Land & Cattle Company and Osborne & Cochran, Inc., but the plaintiff was ignorant of the identity of the authors of the letters and of the situation, and testified that he paid little attention to the papers, relying entirely upon the statements of *Gates.* The plaintiff then left the bank after telling *Gates* that he would make the loan, and upon returning to the bank in the afternoon *Gates* had made the necessary arrangements, having obtained a loan of $7,500 from the *First National Bank of Wauwatosa* and $2,500 from the First Wisconsin Bank of Milwaukee. The plaintiff signed the notes already prepared for his signature by *Gates* and received from *Gates* a note of Osborne & Cochran, Inc., for $10,000 for six months without interest, and with interest at seven per cent. thereafter, and collateral security in the form of $13,000 par value of Clarke's Fork Land & Cattle Company bonds.

Two days later, upon request, the plaintiff again met Osborne and Cochran at the bank and returned in the after- .noon, accompanied by his brother, where they met Osborne and Cochran and again retired to the directors' room. After about a half-hour's talk the plaintiff and his brother went to *Gates,* and the plaintiff told *Gates* that Osborne and Cochran wanted to borrow $35,000 more, with security of two to one in the same bonds. The plaintiff testified that *Gates* then said that the bonds thus given as security would be sold

in the bank first and be credited on the notes; that the bank would sell them; that he could not see how the plaintiff would lose with the security offered and only a $150,000 incumbrance upon the land; that by selling the bonds there, practically all risk was removed; that he, *Gates,* would arrange to raise the money for the plaintiff to use in making the loan. The plaintiff then signed notes and turned them over along with securities with which *Gates* was to raise the money. The plaintiff later received from *Gates* the notes of Osborne & Cochran, Inc., for the sum of $38,000, $3,000 being a bonus, together with $70,000 par value of the bonds of the Clarke's Fork Land & Cattle Company. All of this transaction with respect to the exchange of notes and securities and obtaining the cash was with *Gates* alone, Osborne and Cochran not being present.

In November, 1919, the plaintiff, according to the testimony, met *Gates* after *Gates* had taken a trip to Montana; and testified that *Gates* told him that though he had known that it was a good thing that it went far beyond his expectations; that Osborne and Cochrane had started in business three years previously with $17,000 and now had $350,000. On January 8, 1920, Osborne came to the plaintiff with regard to a further loan of five or six thousand dollars for the purpose of purchasing some cattle at a very favorable figure, but the plaintiff demanded the privilege of clipping the coupons upon the bonds in his possession as collateral, and applying the proceeds to his loan. The plaintiff informed *Gates* of this proposal and of his demand, and testified that when he asked *Gates* if the coupons would be honored that the cashier replied "Surely," after having been informed that the plaintiff would let Osborne and Cochran have the money only if the coupons were good. After this assurance by *Gates* the plaintiff signed a note for $6,000 which Osborne wrote out, and notified *Gates.* About two days later the plaintiff went to the defendant bank, where he received the bonds of the Clarke's Fork

Land & Cattle Company deposited for collateral security for the loan of $6,000, and the plaintiff at the same time signed a note for $6,000 to the Wauwatosa bank.

During the month of January the plaintiff testified that he made inquiries of *Gates* as to why the bonds were not being sold more rapidly and that *Gates* stated that two bonds had been sold and $2,000 had been credited to his notes, but that there was some adjustment to be made with the railroad commission before the sale could proceed, though the securities had already been approved. When the plaintiff clipped the coupons in accordance with the agreement made at the time of the third loan they were dishonored, and *Gates* required him to sign a note to the bank covering the amount, saying at the time that the reason they were not paid was that a sale of the property in question was being negotiated and as soon as this was consummated there would be funds available for paying the entire indebtedness. However, nothing has been paid upon the loans nor upon the coupons, and this action was brought to recover $51,000 and interest from the defendant bank and *Gates* upon the ground that the fraudulent misrepresentations of *Gates,* acting for the bank, caused the plaintiff to make the loans and was the direct cause of the losses incurred by him.

At the trial there was the testimony of Mr. Dinneen, secretary of the railroad commission, to the effect that the records of the railroad commission show that the bonds were permitted to be sold by the railroad commission in February, 1919, but that there was no evidence that they had been passed upon by the securities division, which was inaugurated on August 1, 1919, under the law as changed, nor that the license granted in February, 1919, had been revoked. Mr. Dinneen, however, testified that certain checks beside the listing of the bonds of the Clarke's Fork Land & Cattle Company indicated to him that they were required,

under the law as changed, to be passed upon by the securities division before they could be sold in the state.

Thomas De Swarte, the brother of the plaintiff, testified that *Gates* told him in the presence of his brother that the securities given were as good as government bonds; that he, *Gates,* knew the president of the company, who was a very high-class man, like Mr. Hoyt, the president of the defendant bank; that he thought that Osborne and Cochran were all right, and that he was acquainted with both of them and knew the father of one of them very well, and that Osborne came from a very fine family; that there was absolutely no chance in making the loans to them, for the bank would dispose of all of the bonds within a very short time and the proceeds would be applied to the plaintiff's loans.

The present cashier of the defendant bank testified that the records of the bank show that Osborne and Cochran owed the bank as much as $24,500 on October 21, 1919, which was reduced to $7,500 in February and increased to $12,000 in December, 1920, when this amount was written off as a loss. On October 11, 1919, some $15,000 was paid on the indebtedness of Osborne and Cochran. So far as the records of the bank show, neither Osborne nor Cochran owes anything personally to the bank at the present time.

The defendant *Gates* testified upon adverse examination that he was thirty-nine years of age and had been in the banking business for many years; that he was in charge of the active management of the defendant bank in 1919 and 1920 with the title of cashier; that he knew the plaintiff had recently sold his interest in the Bradford Piano Company and had some money to invest; that he had sold two of the bonds deposited as collateral for the plaintiff's loans and had applied the amount so received to the notes, the bank receiving one quarter of one per cent. commission; that he did not tell the plaintiff that the bonds of the

Clarke's Fork Land & Cattle Company were as good as government bonds; that he did not tell the plaintiff that the bank would sell the larger part of this bond issue; that the bank only delivered bonds sent to them and only about ten or fifteen thousand dollars' worth, the bank receiving one quarter of one per cent. commission.

Evidence was offered to show that the defendant *Gates* made representations to several other persons similar in their nature to those alleged to have been made to the plaintiff, but the court refused to admit this testimony upon objection by the defendants' counsel.

Upon motion of counsel for the defendants the court nonsuited the plaintiff on the ground that the statements of the defendant *Gates* to the plaintiff were matters of opinion and not misrepresentations of fact, and that the plaintiff was negligent in not examining more carefully the papers and letters with regard to the status and condition of the Clarke's Fork Land & Cattle Company, which *Gates* had and which were offered to the plaintiff for examination. The plaintiff appeals from the judgment of the trial court granting the nonsuit.

In this case there are two main questions presented for our consideration, namely, that of the liability of the cashier and that of the bank. On the part of the defendants it is claimed that the statements of *Gates* were in the nature of opinions and promises and are not actionable. It is true that most of the representations were of that nature, but it is our opinion that there were material statements on which the plaintiff had the right to rely which related to a state of existing facts. It was reported to *Gates* as the statement of Osborne and Cochran that the land in Montana was worth approximately $1,000,000 and that the mortgage for $150,000 was the only incumbrance on the land, and that when paid the Clarke's Fork bonds would become a first lien on the property, and *Gates* replied that

"he knew about that; he knew about the value of the land." This statement was of such a character, that the plaintiff doubtless believed and had the right to believe that the bonds to be purchased were also secured by a mortgage or trust deed constituting a lien, a second lien it is true, on land worth $1,000,000. Although *Gates* did not so state in express terms, this was the natural if not the only ·inference to be drawn. In fact, the bonds were the mere personal liability of the corporation secured by no lien whatever. The existence or non-existence of a lien on the land was a matter of fact and not merely one of law. *Darlington v. J. L. Gates L. Co.* 142 Wis. 198, 125 N. W. 456; *Kehl v. Abram,* 210 Ill. 218, 71 N. E. 347; *Hurlbert v. T. D. Kellogg L. & M. Co.* 115 Wis. 225, 91 N. W. 673.

The statements as to the character, solvency, and wealth of Osborne and Cochran also related to a state of existing facts, and from all the testimony the jury would have been justified in believing that they were untrue. Most of the statements ·were repeated in the later conversations when the plaintiff's brother was present. The plaintiff did not hear the statement, sworn to by his brother, that the bonds· were as ·safe as government bonds, and we do not take it into consideration, 'nor do we consider expressions of opinion or promises that the bonds would be taken care of in a few months. There was such testimony that the jury could have found that according to the statements of *Gates* the bank had made arrangements to promptly dispose of the entire issue of bonds. There is much discussion in the brief of the appellant's counsel of the proposition that false expressions of opinions and promises made with the secret present intention not to fulfil them may create liability when material and relied on; and authorities are cited to that effect. We ·do not find it necessary to discuss this question, since we are convinced that there was sufficient evidence of misrepresentations as to an existing state of

De Swarte v. First Nat. Bank, 188 Wis. 455.

facts to be submitted to the jury. There is no doubt, however, that the opinion expressed as to the value of the securities and the safety of the loans to be made and that the bonds would be promptly paid had a tendency to inspire belief in the truth of the statements as to positive statements of fact. Moreover, it has been frequently held by this court that "The mere fact that a statement takes the form of an expression of opinion, however, is not always conclusive. Whenever there is any doubt as to whether it is made as a mere expression of opinion or as a statement of fact, the question must be determined by the jury or court." *J. H. Clark Co. v. Rice,* 127 Wis. 451, 106 N. W. 231; *Miranovitz v. Gee,* 163 Wis. 246, 157 N. W. 790; *Heal v. Stoll,* 176 Wis. 137, 185 N. W. 242; *Rogers v. Rosenfeld,* 158 Wis. 285, 149 N. W. 33. One of the transactions took place in January. We see no reason why the plaintiff could not then rely on the representations made in October.

There is much force in the argument of the defendants' counsel that in whatever representations were made *Gates* acted in good faith believing them to be true. This argument is based on the fact that *Gates,* acting for the bank, helped to finance the plaintiff in furnishing part of the money for the loans he made and accepted as security bonds of the Clarke's Fork Land & Cattle Company, and that he obtained a large amount of the $52,000 furnished by the plaintiff from banks in Milwaukee which also accepted to a considerable extent the same class of bonds as security. It seems quite inconsistent that *Gates* should have known or believed that his statements concerning the value of the securities were false and that at the same time he should have not only relied on the securities for his own bank but induced other banks to do so. It is also of some significance in this connection that the bank continued to make loans to Osborne & Cochran, Inc., after October 11th. But it does

not necessarily follow that the defendant cashier is to be freed from responsibility because he may have believed the representations made. A reckless or careless person may do as much harm as one who intentionally deceives, although the moral blame is not the same. It has been frequently held by this court in actions for damages in the sale of property that if the representations were false and material and the maker either knew or ought to have so known, or if he made them recklessly or without knowledge of the facts and they were relied on as true by the party wronged without the present means of knowledge of their falsity, and he suffered damage by reason of the misrepresentations, a cause of action arises. *Krause v. Busacker,* 105 Wis. 350, 81 N. W. 406; *Bird v. Kleiner,* 41 Wis. 134; *Cotzhausen v. Simon,* 47 Wis. 103, 1 N. W. 473; *Montreal River L. Co. v. Mihills,* 80 Wis. 540, 50 N. W. 507; *Beetle v. Anderson,* 98 Wis. 5, 73 N. W. 560. When the conditions already stated exist, there may be liability for misrepresentations as to the solvency of a third person when they are made recklessly or in culpable ignorance. *Shaw v. Gilbert,* 111 Wis. 165, 86 N. W. 188; 12 Ruling Case Law, 350, 351; 26 Corp. Jur. 1188, 1189.

It is further argued by counsel for the defendants that the plaintiff had no right to rely on the representations of *Gates,* since he had the opportunity to examine the sources of *Gates'* information, and attention is called to the fact that the plaintiff had had business experience and experience in buying bonds. It is true that maps and letters and other literature were available to the plaintiff if he had seen fit to spend time in examining them, but we are convinced that any such inquiry by the plaintiff would have been of no avail. The lands on the value of which the plaintiff largely relied were in a distant state. It would have been difficult and expensive for him to obtain first-hand knowledge of the bonds on which he relied as security for his

loans. *Gates* professed to have the necessary knowledge of such values and of the character of the men with whom the plaintiff proposed to deal. Whether or not there was a confidential relation, *Gates* had superior means of knowledge and better opportunity for ascertaining the facts which affected the value of the bonds in question, and under the circumstances we consider that the plaintiff had the right to rely on the statements made. *International M. Co. v. Priem,* 179 Wis. 622, 192 N. W. 68; *Ohrmundt v. Spiegelhoff,* 175 Wis. 214, 184 N. W. 692; *Swoboda v. Rubin,* 169 Wis. 162, 170 N. W. 955; *Heal v. Stoll,* 176 Wis. 137, 185 N. W. 242; 12 Ruling Case Law, 382.

We now have to consider whether the bank became liable by reason of the representations of its cashier. If the representations were made in the usual course of business of the bank and within the lawful field of its corporate activity, it would not necessarily escape liability merely because the acts of the agent were tortious and fraudulent. It is well settled that when certain kinds of business within the corporate powers of a bank are delegated to a cashier or other agent, he is the corporation in conducting that business, and if he acts negligently or fraudulently in so doing the corporation may be held liable, as will appear from the authorities herein cited.

Counsel for the appellant cite various decisions of this court in which banks have been held liable for acts and statements of cashiers and other officers in the course of the banking business. *Mitchell St. State Bank v. Schaefer,* 169 Wis. 543, 173 N. W. 330; *Fillbach v. First Nat. Bank,* 177 Wis. 520, 188 N. W. 655; *Pulaski State Bank v. Kadziszak,* 180 Wis. 218, 192 N. W. 987; *Stevens v. Montfort State Bank,* 183 Wis. 621, 198 N. W. 600; *Arnold v. Nat. Bank of Waupaca,* 126 Wis. 362, 105 N. W. 828. In the first three of these cases it was held that the representations or acts were in the regular course of the banking

business or in business in which the bank had, to some extent, engaged. In *Stevens v. Montfort State Bank* the plaintiff had been induced to permit large balances to remain to her credit in her checking account by the representations of the cashier that the directors had agreed to pay interest on the daily balances at the rate of six per cent. It was argued by the defendant in that case that the cashier had no authority to make such an agreement. It was held that, in view of the agreement and the long acquiescence of the directors in the conduct of the cashier and the payment of the interest pursuant to the agreement, the bank was estopped from taking advantage of its otherwise illegal acts. Much reliance is placed by the counsel for the appellant on the case of *Arnold v. Nat. Bank of Waupaca,* 126 Wis. 362, 105 N. W. 828. This was an action by a real-estate agent for recovery for services in finding a customer for the purchase of some land. The evidence showed that among the duties and authority actually imposed on the cashier of the bank was that of taking the usual steps to find customers for certain classes of lands which had been acquired by the bank. It was objected that the cashier had no authority to contract as to lands in which the bank had no interest. It was held that if an individual employs an agent to find a customer for certain lands, he becomes liable for the agreed compensation, whether he owns them or not, although he may have acted on the mistaken supposition that he had title; and that when a business is conducted by a corporation, safety and justice require that it be held to the same responsibility as an individual for the detail acts involved; and that when an agent is clothed with the power of the corporation to conduct a certain business, he is also clothed with the power on behalf of the principal to make mistakes and representations, as might an individual, in the ordinary course of business.

Counsel for the appellant also rely on certain decisions in other jurisdictions. In *Hindman v. First Nat. Bank*, 98 Fed. 562, there was a demurrer to the petition or complaint, which set up in great detail that the defendant bank, in order to start an insurance company in business and thereby secure for itself a large deposit account and for the further purpose of selling the stock of the insurance company pledged to it as collateral, assisted the insurance company to obtain a license by directing its cashier to certify to the insurance commissioner that the company had on deposit with it $248,000. A license was issued on the faith of the certificate. It was charged that the bank united with others to publish similar statements to those contained in the cashier's affidavit. The plaintiff, induced by these publications and the statements in the cashier's affidavit, purchased a considerable amount of stock of the insurance company, which the bank held as collateral. The stock was worthless and known to be so by the bank. It was contended by counsel for the defendant bank that the statement of the cashier was *ultra vires* and could not be a ground for holding the bank for deceit. The demurrer was overruled. It was held that if a bank, in order to increase its deposits or sell its collateral, makes or causes to be made false statements concerning the financial condition of one of its customers or depositors to a third person for the purpose of misleading him to his injury, the bank is liable if loss ensues. But it was expressly stated that the question was not one of the authority of the cashier, as the petition expressly averred that the certificate was made by order of the board of directors.

In *Community State Bank v. Day*, 126 Wash. 687, 219 Pac. 43, the bank was held liable for the false representations of its cashier which resulted in inducing the defendant to execute a note to the bank in payment of capital stock of another company, when the bank immediately applied the

note upon the indebtedness of the company to it, having recently taken a mortgage on all of the property of the company, a fact which was not disclosed to the injured party. It was held that the cashier was engaged in the business of the bank and that his knowledge was the bank's knowledge. In the case of *Nevada Bank v. Portland Nat. Bank*, 59 Fed. 338, on demurrer to the complaint, it was held that a national bank is liable for fraudulent representations made by it through its cashier in letters to another bank as to the financial responsibility of a customer. But the decision was based upon the ground that it was alleged in the complaint, which must be taken as true, that the defendant bank itself made the representations by its cashier and that the letters were written and sent by the bank. It was alleged that it was the purpose of the bank by the representations to secure an advantage to itself and that one of the letters was written in direct response to a letter directed to the defendant bank.

In the instant case there was no evidence that the bank or any of its officers had engaged in the business of making representations or giving advice on the values of securities of corporations existing in other states. There was no evidence that any such express or implied authority had been conferred on the cashier. So far as appears from the evidence, this was the first time the cashier had made representations or given advice in any transaction of this nature. It does not appear that any other officer of the bank authorized or had any knowledge of the representations made by him. Counsel for the appellant stress the fact that the day after the plaintiff lent the large sums to Osborne & Cochran, Inc., the individual indebtedness of Osborne and Cochran was paid to the bank, and it is argued that the bank profited by reason of the loans made by the plaintiff; and it is urged that the cashier and the bank were in collusion with Osborne and Cochran to secure for them loans in order that the bank

might thus be enabled to collect its notes from them.   The bank had been making loans to Osborne and Cochran and to Osborne & Cochran, Inc., from June until October.   There is nothing in the evidence to show that for some time after October 10th they were not regarded as solvent.   The bank continued to loan Osborne & Cochran, Inc., money after the transactions in question, and Osborne & Cochran, Inc., were indebted to the bank on October 21st in the sum of $24,500. There was no proof that any of the money loaned by the plaintiff to Osborne & Cochran, Inc., was used to pay the indebtedness of the individuals, and the contention that there was any plan to defraud the plaintiff for the enrichment of the bank is wholly unsupported by the evidence.

We have reviewed the authorities relied on by counsel for the plaintiff to establish their claim that the bank is liable for the representations made by its cashier.   The decisions asserting such liability were almost, if not wholly, without exception, in cases where the wrongful acts of the cashier or other agent were in the course of business of the banks or had been authorized or acquiesced in by the directors.   In the case before us there had been no express or implied authority given to the cashier to make representations as to the solvency of third persons or the value of their securities.   There was no proof of acquiescence on the part of the directors in such acts of the cashier.   There is much authority for the rule that false representations made by a cashier under such circumstances are not within the scope of his employment and do not bind the bank.

In *Taylor v. Commercial Bank,* 174 N. Y. 181, 66 N. E. 726, the cashier made false representations as to the solvency of one of the bank's customers to one who made inquiries on the subject and sold goods on credit, relying on the representations, and suffered loss.   In the opinion it was said:

"If we assume, which we do not decide, that the representations were sufficient to render the cashier personally

liable, still the serious question in this case is whether the bank is liable for the statements made by its cashier. Obviously, when the representations were made, the cashier was not engaged in the transaction of the business of the bank. It is equally clear, as we shall see later, that it is no part of the duty of a bank cashier to make representations as to the responsibility of its customers or others."

"The duties of a cashier are strictly executive. He is properly the executive agent of the board of directors, as such to carry out what it devises as to the management of the business of the bank. There are certain functions which, by long and universal usage, have come to be recognized as belonging to the office of cashier. They are declared to be inherent in the office or position as a matter of law, and, unless restricted or enlarged, they, and they only, can be performed by him by virtue of his appointment. Under the circumstances of this case it is plain that it could not be properly held that the defendant's cashier was acting within the scope of his employment in making the representations complained of."

In the case of *First Nat. Bank v. Marshall & Ilsley Bank,* 83 Fed. 725, the cashier of the former bank, in response to a letter of inquiry from the latter, made certain representations as to the habits, financial standing, and property of a third person. The answer did not disclose, but concealed, the fact that such third person was indebted to the bank and that it held liens on his property. Relying on the letter the Milwaukee bank made a loan to the person concerning whom the inquiry was made, and it was one of the questions involved whether the Manistee bank was liable for the fraudulent representations. In the opinion it was said:

"In this statement the real estate in question was included. In considering this letter and its effect, it becomes necessary to first determine whether it is to be treated as the letter of the bank, and affecting it as such, as seems to have been the view of the circuit court and certainly the view presented by counsel for the Milwaukee bank in argument at the bar. We are clearly of the opinion that Dunham cannot be re-

garded as acting for or as the agent of the bank in writing this letter. The acts and declarations of a cashier of a bank are binding on the bank, and affect it only when the cashier is in the discharge of his duty as such cashier, acting either. in the general line of duty or in regard to some business transaction with the bank pending at the time and coming within his duty and authority. It is not insisted that there was any express authority conferred upon Dunham, cashier, to make voluntary answers of this kind to other banks or the customers of other banks, although the practice of doing so is very common in the nature of the case. It is well understood to be a mere favor or courtesy, such as one banking institution extends to another. It was no part of the duty of Dunham, as cashier, to furnish such an answer as he did; and, not being a duty belonging to his position, there was no implied authority from the bank to do so."

The same question arose in *Horrigan v. First Nat. Bank,* 68 Tenn. 137, and it was held that it is no part of the business of the cashier of a bank to answer questions as to the solvency of parties, nor is it included within the scope of such business. In *Mapes v. Second Nat. Bank,* 80 Pa. St. 163, the attempt was made to hold the bank liable for false representations made by the cashier and one of the directors. The fraud relied on was that the fraudulent statements as to the solvency of a third person induced the plaintiff to indorse his paper; that the bank officers knew he was insolvent and concealed the fact that he was largely indebted to the bank whose officers made the fraudulent statements. In the opinion it was said:

"How can such a declaration, not made in the course of their duties as officers or agents of the bank, even admitting it to have been wilfully false, affect their principal? It would be subversive of every well settled principle which regulates the relation of principal and agent and the responsibility of the principal for the acts and declarations of his agent."

In the case of *U. S. v. City Bank,* 21 How. 356, the cashier of a bank wrote to the secretary of the treasury

of the United States stating that the bearer of a letter was authorized to contract for the transfer of money from New York to New Orleans. It was held that since the letter of the cashier was his own act and without the authority of the board of directors, it did not bind the bank. In the case of *Farmers' State Guaranty Bank v. Cromwell,* 70 Okla. 199, 173 Pac. 826, it was claimed that the note sued on was given by reason of false representations made by the president and cashier as to the value of bank stock purchased by the defendant. It was stated in the opinion that:

"The defendant's evidence shows that the things relied upon to defeat the recovery on his note were mere personal transactions, not concerning the business of the bank, and that liability, if any resulted therefrom, rested upon the officers and not upon the bank. It is no part of the duty of the bank cashier to pass out, gratuitously or otherwise, to prospective purchasers of stock in the bank, information as to the financial standing of the bank, or to advise as to the value of its stock, nor is it any part of the duty of the president of the bank to advise such persons as to the value of the stock. The record does not show that either the cashier or president was authorized to make representations of this kind or character, or that the board of directors had any knowledge that they had made such representations, and for that reason there can be no grounds for the contention that the wrongful acts of the officers had been ratified by the directors."

In the case of *American S. Co. v. Pauly,* 170 U. S. 133, 18 Sup. Ct. 552, the president of a bank made a statement as to the honesty and fidelity of an employee for his benefit and to enable him to obtain a bond insuring his fidelity. It was one of the issues whether the president had authority to make the statement in question. After holding that the bank did not authorize the official to make the representation and was not aware that it had been made, the court said:

"What, therefore, Collins assumed in his capacity as

president to certify as to O'Brien's fidelity or integrity was not in the course of the business of the bank nor within any authority he possessed. He could not create such authority by simply assuming to have it. The circuit court of appeals, speaking by Judge LACOMBE, well said that there were many acts which the president of a bank may do without express authority of the board of directors, in some cases because the usage of the particular bank impliedly authorized them, in other cases because such acts were fairly within the ordinary routine of his business as president; but that the making of a statement as to the honesty and fidelity of an employee for the benefit of the employee, and to enable the latter to obtain a bond insuring his fidelity, was no part of the ordinary routine business of a bank president, and there was nothing to show that by any usage of this particular bank such function was committed to its president." Page 156.

See, also, *Bank of the Metropolis v. Jones,* 8 Pet. (33 U. S.) 12; *First Nat. Bank v. Ocean Nat. Bank,* 60 N. Y. 278; *American Exp. Co. v. Citizens State Bank,* 181 Wis. 172, 194 N. W. 427; *Consolidated M. Co. v. Fogo,* 104 Wis. 92, 80 N. W. 103; 1 Michie, Banks, pp. 776, 778.

Many other authorities might be cited holding that cashiers or other agents do not bind banks by representations made outside the scope of their business, when the statements are unauthorized or unratified by the bank. Perhaps we have quoted the cases at unnecessary length, but the questions here involved have seldom come before this court and they are of great importance to banks and to the general public.

In this case the plaintiff was a stockholder in the bank and was presumed to have knowledge of the powers and duties properly exercised by the cashier. He did not ask the bank to guarantee the bonds and probably knew that the bank had no power to do so. He doubtless had confidence in the business judgment of *Gates,* but it was in his judgment as an individual and not as cashier. If *Gates* had re-

De Swarte v. First Nat. Bank, 188 Wis. 455.

signed as cashier a few days before October 10th, his statements and opinions as to the value of the bonds would have been just as valuable to the plaintiff as if they had been made at the cashier's desk.

The banking business at best is attended with many hazards as well as grave responsibilities. Bankers are often criticised because, as it is said, they are too reluctant to extend credit and to respond to the needs of the business public. If they are too liberal in giving credit and disaster comes they are still more bitterly criticised, and in their disgrace encounter the hatred of innocent depositors. In order to prevent bank failures and the disastrous consequences which follow them, legislators and the courts unite in the effort to confine banks and their officers within the field of their legitimate powers. Bank officials are on dangerous ground when, either on behalf of the bank or as individuals, they engage in speculative ventures, and we constantly find disastrous failures traceable to such a practice. If banks were to be held liable for the advice or even the unauthorized false statements of their cashiers or other agents concerning investments which from their very nature are more or less speculative, a new and very serious peril would be added to the banking business. Such a policy would tend to increase the number of bank failures, already far too frequent, and also to increase the losses to depositors and other customers of banks to the detriment of the general public. Various other questions are argued which it becomes unnecessary to discuss.

It is our conclusion that the plaintiff is entitled to a new trial as against the defendant *Gates,* but that as against the defendant bank the complaint should be dismissed.

*By the Court.*—The judgment is affirmed in part and reversed in part, and the cause is remanded for further proceedings to be had in accordance with this opinion.