Van Dale, Respondent, vs. Prudential Insurance Company of America, Appellant.

*May 24—June 21, 1937.*

For the appellant there was a brief by *Lines, Spooner & Quarles,* attorneys, and *Leo Mann* and *L. S. Clemons* of counsel, all of Milwaukee, and oral argument by *Mr. Clemons.*

For the respondent there was a brief by *Shockley, Mattison & Weinberg* and *Gold & McCann,* attorneys, and *Morris*

*Karon* of counsel, all of Milwaukee, and oral argument by *Mr. Karon* and *Mr. Philip Weinberg.*

NELSON, J.  The defendant contends, (1) that at the time the releases were obtained and the policies surrendered for cancellation and reissue it did not conceal any material information from the plaintiff; (2) that it made no affirmative misrepresentations; (3) that the plaintiff did not rely upon any alleged misrepresentations or concealment by the defendant; (4) that the plaintiff, by his conduct, ratified the releases and the settlement made; and (5) that the plaintiff did not establish that he is disabled within the meaning of the disability provision of the policies.  The contentions of the defendant necessarily require a full statement of the relevant facts.

At the time of the trial the plaintiff was forty-nine years old.  From January 18, 1926, up to June 4, 1932, he was employed by the defendant, first as a soliciting agent and later on as an assistant superintendent, having a crew of nine men under his supervision.  While so employed he was apparently successful.  His work was favorably commented upon in letters directed to him by his superiors in the home office.  At the time he quit work on June 4, 1932, he had four life insurance policies issued by the defendant.  The first policy, dated June 28, 1917, insured the plaintiff's life for $2,000.  It contained a deductible disability clause and waiver of premiums in the event of total and permanent disability.  The second policy, dated July 2, 1928, insured the plaintiff's life for $5,000.  It provided for disability payments of $50 per month to the plaintiff in case of disability, without reduction of the face amount of the policy.  The other two policies were group insurance policies issued to him as an employee and evidenced by two certificates, each in the amount of $6,000.  These two policies provided for the payment of disability income with reduction of the face amount of the cer-

tificates and also for a waiver of premiums. Each of the four policies contained substantially the following disability provision:

"If the insured shall become totally and permanently disabled, either physically or mentally, from any cause whatsoever, to such an extent that he is rendered wholly, continuously and permanently unable to engage in any occupation or perform any work for any kind of compensation of financial value during the remainder of his lifetime . . . the company . . . will grant the following benefits: . . ."

In November, 1931, the defendant informed its employees that after January 1, 1932, it would cease writing disability insurance. The plaintiff thereafter applied for a $5,000 policy with a disability provision, and was examined by a company doctor who sent in a confidential report to the company which was not shown to the plaintiff. The application was rejected, but the defendant offered the plaintiff a policy without disability benefits and rated at the highest rate which it wrote. The plaintiff refused the policy. Later on, Mr. Zimmer, the defendant's superintendent in Milwaukee, advised the plaintiff to have a thorough medical examination. Accordingly on May 16, 1932, the plaintiff was examined by his family physician, Dr. Roberts, and by Dr. Bockhorst, a company doctor. Both doctors gave plaintiff and the company copies of their reports and findings and, on the instructions of his doctor, plaintiff quit work on June 4, 1932. The plaintiff testified that for months before he quit work he had constant pains across his chest every day, which sometimes were sharp, that he had pains in the back of his throat, the side of his head, and down his left arm, and that his feet would swell, that he felt very tired, that rest would do him no good, that he slept very poorly, some nights not at all, that his voice changed and became hoarse, that he perspired a great deal nights for several hours at a time, his body seeming as if it were burning up, to such an extent that he could

not sleep and would have to get up, that he could walk only a few blocks without getting tired, short of breath, and feeling pain, that he lost considerable weight. The plaintiff's wife corroborated him in substantially all respects. In the summer of 1932, the plaintiff applied for disability income pursuant to the terms of his policies. The application was accompanied by Dr. Roberts' proof of disability, dated September 14, 1932. Dr. Roberts diagnosed the plaintiff's trouble as aneurysm of the aorta. It was his opinion that the insured was incapable of performing all parts of his usual work; that the plaintiff was incapable of performing all other gainful work; that the plaintiff had been continuously wholly incapable of engaging in any gainful work from May 16, 1932; that the insured had not recovered sufficiently to engage in any gainful work; that the insured was so disabled that he would for all time be prevented from engaging in any gainful work of any kind. Upon receiving Dr. Roberts' proof, the defendant sent the plaintiff to Dr. Stranberg, one of its own doctors, for an examination. Dr. Stranberg reported, as to the character of disability: "Aneurysm," and as to his opinion as to when duties may be resumed: "No." On the reverse side of the report used for further details, Dr. Stranberg, among other things, wrote "Of course, the prognosis is serious and I do not believe he should work at present. Perhaps a subsequent examination will change the prognosis. . . . The cough was the result of the aneurysm. I believe he is totally and permanently disabled. He has severe pain at most of the time." On December 17, 1932, the defendant finally declared plaintiff totally disabled and paid him the monthly disability income under its four policies, commencing as of September, 1932. These payments continued until December, 1933. On August 18, 1933, plaintiff's wife wrote defendant stating that they had a mortgage on their home, that due to plaintiff's illness it was difficult to meet the pay-

ments, that the mortgagee was willing to take $5,000 in settlement, which would amount to quite a saving to the plaintiff; and asked defendant whether it would be possible to pay up in full one of plaintiff's group insurance policies. At that time the balance left on each group policy was $5,357.60. The defendant replied that the matter was referred to a local representative. On September 28, 1933, the defendant wrote that it had requested Dr. Thompson, its medical referee in Milwaukee, to make an examination of plaintiff, and upon receipt of his report it would inform her more definitely. On November 1, 1933, defendant wrote that it had received Dr. Thompson's report, and that it desired an examination to be made by a "noted cardiologist." The defendant cautioned her not to infer from the investigation that it was obligating itself to grant the advancement, but was looking into the matter carefully so that no injustice would be done. On December 20, 1933, the defendant wrote to the plaintiff informing him of its "inability to comply with your wishes;" that it had "hoped that an exception might be taken in your case if all of the factors seemed to warrant such a departure from our general practice. With this in mind we proceeded in good faith to ascertain the facts." The letter referred to the original diagnosis of aneurysm by Dr. Roberts, and the subsequent examination by its doctor and an eminent cardiologist which revealed that the plaintiff was not suffering from aneurysm. The letter continued, "as it was on the basis of such a diagnosis that your claim was approved and as we now deem you capable of engaging in a gainful occupation, we must inform you that disability payments are being discontinued and your policies are being restored to a premium paying basis."

In this letter it was further stated:

"We realize that your first reaction after having been informed of the termination of disability instalments might be

one of disappointment and we would be inclined to regret this outcome of your request were it not for the conviction that upon further reflection you will agree with us, the assurance that the original alleged disabling condition does not exist and that you are again able to take up some profitable employment, more than compensates for the monthly disability income."

Dr. Thompson's report was in the possession of the defendant at the time it wrote the letter of December 20th. Dr. Thompson reported at length and said:

"I think we are perfectly safe in the assumption that this man has no aneurysm."

In answer to the question as to the future possibilities of the condition's causing disability, Dr. Thompson stated:

"It is rather difficult to say, but I judge that the condition will not progress rapidly beyond what he has now."

Dr. Thompson expressed the opinion that the insured was wholly incapable of performing all parts of his usual work. As to whether the insured was incapable of performing all other gainful work, Dr. Thompson said:

"I am somewhat in doubt here, but I am inclined to believe that this man could do some small things."

In answer to the question:

"If totally disabled, from what date had the insured been continuously wholly incapable of engaging in any gainful work?" Dr. Thompson stated: "From the fourth day of June, 1933." (Obviously an error as to the year.)

In answer to the question:

"Is the disability in your opinion of such a nature that the insured will never for the remainder of his or her lifetime be able to engage in profitable employment of any kind?" Dr. Thompson answered: "As I stated above, I believe this man is capable of doing some slight work at this time."

In answer to the question as to when he thought the insured would be able to take up some form of employment, Dr. Thompson answered:

"It depends upon whether or not this man has a definite angina or not."

On December 20, 1933, the defendant also had in its possession a report of an examination of the plaintiff by Dr. Rogers, cardiologist. The report dealt with present complaints, habits, family history, past illness, physical examination of the cardiovascular system, and the revelations of the electrocardiograms. In forwarding the report Dr. Rogers summarized his conclusions.

"From the physical examination and the electrocardiograms I could find no evidence which would warrant a diagnosis of 'organic heart disease with permanent total disability' at this time. . . . There is no suggestion, from the electrocardiographic evidence at hand, that this man is suffering from coronary artery changes."

Mrs. Van Dale, writing for the plaintiff, acknowledged the receipt of the defendant's letter of December 20th, in which she took issue with the statement of the defendant that it deemed the plaintiff capable of engaging in a gainful occupation, and in which she offered to have her husband undertake a trip to Newark (the home office), at his own expense, that the company's physicians might thoroughly examine him and see for themselves just exactly what condition he was in. Apparently no reply was made to this letter. On January 3d, a Mr. Garrigle, an experienced adjuster from the home office, appeared in Milwaukee without notifying the plaintiff or his wife of his coming. The first notice that they had was a telephone message from the Milwaukee office asking them to come to that office and to bring with them their insurance policies. The plaintiff and his wife testified that they arrived at the office at about 12 o'clock; that they met

Mr. Garrigle, who stated that he was from the home office; that he asked the plaintiff if he was ready to go back to work, but upon looking at him said that he did not think he was capable of going back to work; that Garrigle stated that the plaintiff was not entitled to the disability payments that he had been receiving for the past year and a half; that he then told the plaintiff of a plan that he had whereby the company would pay disability payments for eighteen months in advance in consideration that the two life policies be rewritten and the two group policies lifted; that the plaintiff and his wife stated that that was a serious matter to decide in so short a time, and requested three days' time to think it over; that Mr. Garrigle said he had come all the way from Newark on this business and had to catch a train leaving Milwaukee at 1:30; that Garrigle also told the plaintiff of several cases that he had settled, disability cases, and told the plaintiff that if he did not accept the offered payment it would be useless for him to go to law regarding the same as he knew the law and was versed in those matters; that the plaintiff and his wife signed the releases without having an opportunity to get any advice from a doctor or other people before signing. Both the plaintiff and his wife denied that any of the medical reports to the company were exhibited to them or read to them. Garrigle testified that he showed Mr. and Mrs. Van Dale the reports and said:

"There is no evidence you are totally and permanently disabled. You can see for yourself from the reading. I told him that the medical findings from the examination of these doctors disclosed no evidence that he was totally and permanently disabled."

Mr. Garrigle further testified that Van Dale did not take kindly to the findings at first and said that he was still disabled. Garrigle testified that he said: "You can't be when the medical men have examined you and shown to our home office that you are not," and further, "there is no use of us

arguing about it, there are the company's findings and you will have to hereafter pay the premiums on these policies." The plaintiff and his wife signed the receipts and delivered up to Mr. Garrigle the four policies without taking receipts therefor. Under date of January 11, 1934, the company sent to the plaintiff for execution a revised release of one of the policies which the plaintiff signed and returned to the company. On February 7th, the defendant sent to the plaintiff two checks aggregating $4,210.20. These checks were held by the plaintiff until March 14th, when they were deposited in a bank for credit. The $5,000 life insurance policy had been assigned to the Wauwatosa State Bank so that it was necessary to obtain a release of that policy signed by both the plaintiff and the bank. This release was obtained on July 19th, when the sum of $900 was paid to the bank. While the first two checks were being held, Mrs. Van Dale, on February 21, 1934, wrote a letter to the company in which, among other things, she informed the company that "our physicians inform us Mr. Van Dale never again will be a well man. . . . I just felt I had to write you and explain all this, because I know you will understand what it means to a husband and father of three children to be told the above statement. I don't believe the disability payments should have been stopped in a case of this kind. . . . We surely have nothing but the highest esteem for your Co. and for all the kindness they have shown us. I know, Mr. Munsick, you will see that this 'claim' is adjusted satisfactorily." The company replied to this letter and stated, among other things :

"As you know, Mr. Van Dale was for some time in the receipt of disability benefits which were payable only if he was totally and permanently disabled ; that is, so disabled that it was not expected he would ever again be able to do any gainful work. . . . A report was consequently obtained from our medical referee, Dr. Thompson, from which it appeared that Mr. Van Dale could no longer be considered disabled

and could no longer be considered entitled to the payment of disability benefits."

The plaintiff, after signing the releases on January 3d, was again examined by his family physician and by another physician and was X-rayed by another. Upon the trial the medical testimony was conflicting as to whether the plaintiff was so disabled as to be unable to perform any gainful work in the future.

Taking up the several contentions of the defendant, we shall treat them in their order : (1) Did the defendant, at the time it obtained the releases, conceal material information from the plaintiff ? As to this contention, there was clearly an issue of fact. The plaintiff denied that any of the medical reports in the possession of the defendant were exhibited to him or read to him. So there is clearly evidence that whatever the reports contained they were concealed from him, and it seems clear that the reports of Dr. Stranberg and Dr. Thompson contained information which was material on the question of obtaining the releases. Even though pressed for money to save his home from threatened foreclosure, it seems clear that the plaintiff would have hesitated long in signing the releases had he known of the opinions expressed by some of the defendant's medical specialists. We think the trial court committed no error in refusing to change the answer to question 1.

Did the defendant make affirmative misrepresentations? We think it clear that the jury was warranted in finding that the company, in its letter of December 20th, and through its agent Mr. Garrigle, did make representations which were not warranted or supported by the information which had been given to it by its medical specialists. Mr. Garrigle told the plaintiff that the medical findings disclosed no evidence that the latter was totally and permanently disabled, and when the

plaintiff asserted that he was still disabled, Garrigle concededly said:

"How can you be when the medical men have examined you and shown to our home office that you are not."

In its letter of December 20th, the company, after stating that the plaintiff was not afflicted with aneurysm of the aorta, said:

"As it was on the basis of such a diagnosis that your claim was approved and as we now deem you capable of engaging in a gainful occupation, we must inform you that disability payments are being discontinued and your policies are being restored to a premium paying basis."

We think that the jury was warranted in concluding that affirmative misrepresentations were made to the plaintiff not only in the interview with Mr. Garrigle on January 3d, but also in defendant's letter of December 20th. The trial court, in our opinion, did not err in refusing to change the answer to question 3.

Did the plaintiff rely upon any misrepresentations as to the medical reports or the concealment thereof by the defendant?

There is, in our view, ample support in the evidence for the finding of the jury that the plaintiff relied upon the representations made in signing the releases. It is true that at that time the plaintiff knew exactly how he felt and what his symptoms were, but he did not know the medical meaning thereof. He knew that his family physician considered him totally disabled. He must have known or realized that Dr. Stranberg, who had examined him for the company some eighteen months before, was at that time in substantial accord with Dr. Roberts, his own physician. But the plaintiff was a layman who, in weighing the representations of the defendant as to the opinions and findings of its specialists, and comparing them with the findings and opinions of his own

physician, who apparently was a general practitioner, not a specialist, might naturally rely upon the opinions asserted to be those of the specialists. The situation which confronted him is well described by the plaintiff's counsel in their brief:

" 'The company's doctors say I am not disabled, my doctors say I am. With such opposite opinions, particularly when the company's doctors are eminent specialists, while mine are general practitioners, I will settle.' But if he knew that the company's doctors said he was disabled, even though stating that they had doubt but what he might not be able to do some slight work, his reaction would then be, 'If my own doctors say I am disabled and I feel sick and disabled, and the company's doctors admit almost as much, I will rely upon how I feel and what my own doctors say and refuse to settle.' "

Whether a party relied upon representations made to him ordinarily presents a question of fact for the jury. *Barndt v. Frederick,* 78 Wis. 1, 11, 47 N. W. 6; *Ripon Knitting Works v. Railway Express Agency,* 207 Wis. 452, 461, 240 N. W. 840; *Madison Trust Co. v. Helleckson,* 216 Wis. 443, 450, 451, 257 N. W. 691. We think that, under the evidence, it was permissible for the jury to find that the plaintiff relied upon the misrepresentations made by the defendant to him.

Did the plaintiff, by his conduct, ratify the releases and settlement made on January 3d? It is argued that the plaintiff ratified the releases and settlement as a matter of law, (1) by signing the revised release as to one of the policies which was sent him some eight days after January 3d; (2) by holding the two checks until March 14th, and then depositing them; (3) by signing the joint release with the Wauwatosa State Bank on July 19, 1934; and (4) by consulting between January 3d and February 21st, his own physician and two others who told him that he was unable to do any kind of work. While these occurrences afford a basis for an argument on the facts, they do not show ratification as a

matter of law, nor do they show that the plaintiff thereby obtained any information calculated to disclose that the defendant had misrepresented the findings of its specialists. He did not go to the defendant's Drs. Stranberg, Thompson, or Rogers and ask them what they told the defendant. That is what he would in all probability have done had he doubted the representations made or not relied upon them. If the plaintiff had a right to rely upon the representations made to him on and before January 3d, he had the right to continue in such reliance up to the time he deposited the checks or executed the final release with the bank. In *De Swarte v. First Nat. Bank,* 188 Wis. 455, 206 N. W. 887, it was held that the fact that the representations were made in October, did not prevent plaintiff from relying thereon in a transaction which took place in the succeeding January. In our view, the question of ratification is closely allied with that of reliance. If the plaintiff, as the jury found, relied on the representations made on January 3d, we perceive no reason for holding as a matter of law that said reliance might not continue up to July 19th, in view of the fact that he did not, up to that time, discover the falsity of the representations made. Ratification clearly involves on the part of him who ratified, a knowledge of the material facts. We conclude that ratification as a matter of law did not occur in this case.

Did the plaintiff establish by the evidence adduced at the trial that he was disabled within the meaning of the disability provision of the policies? As hereinbefore stated, there was a sharp dispute between the doctors as to that issue. The jury found that he was so disabled. That finding was approved by the trial court. It is our opinion that such finding, approved as it was by the trial court, may not be disturbed.

But one other point argued by the defendant need be considered. The trial court was of the opinion that a confidential

or fiduciary relationship existed between the plaintiff and the defendant. We see no warrant for such a conclusion. True, the plaintiff had been in the employ of the defendant for a number of years, had been a valued employee, had enjoyed and received the approbation of his employer, and rightly had faith and confidence in the defendant company, but those facts did not create a fiduciary relationship. It rather showed a situation which tended to render the plaintiff's testimony that he relied upon the representations made to him, the more readily believed. While the trial court found that a fiduciary relationship existed, we do not consider that it regarded such finding as so important that it would not have approved of the verdict as rendered had it not been of the opinion that such relationship existed.

*By the Court.*—Judgment affirmed.