[Civ. No. 1592. First Appellate District.—May 24, 1916.]

## MAXWELL BROWNE, Respondent, v. COMMERCIAL UNION ASSURANCE COMPANY OF LONDON, ENGLAND, (a Corporation), Appellant.

INSURANCE LAW—APPOINTMENT OF LOCAL AGENT—SCOPE OF AUTHORITY—CONSTRUCTION OF INSTRUMENT.—A local agent of an insurance company has no authority to make a binding contract of insurance under a letter of the general manager appointing him as agent for the transaction of insurance in a stated locality subject to such instructions as may from time to time be given him by the home

office, and providing therein that "policies will be written at the general office."

Id.—General and Local Agents—Distinguishing Feature.—The authority to complete contracts primarily differentiates a general agent having power to bind his principal from mere soliciting agents and other intermediaries operating between the insured and the insurer, who have authority only to initiate contracts, and consequently cannot bind their principals by anything they may say or do during preliminary negotiations.

Id.—Automobile Insurance—Mistake in Application—Retention of Policy After Knowledge—Estoppel.—A holder of a policy of automobile insurance, who upon discovery of a mistake made by him and the local agent of the insurance company in attaching the wrong "rider" to his application for the policy, which they both believed covered risks against collisions, elects to retain the policy issued to him, and neither requests the issuance of a different policy, nor offers to pay the premium requisite to insure against the risk which he believed the rider to cover, thereby accepts the policy, and cannot in the case of a collision ask for reformation of the policy and judgment for damages from the collision.

APPEAL from a judgment of the Superior Court of Monterey County, and from an order denying a new trial. B. V. Sargent, Judge.

The facts are stated in the opinion of the court.

Goodfellow, Eells, Moore & Orrick, and Norris & Warth, for Appellant.

Daugherty & Lacey, for Respondent.

LENNON, P. J.—This is an action upon a policy of automobile insurance in which the plaintiff prays for judgment in the sum of $1,350, the amount of a loss claimed to be due under the policy, and also prays that if in the judgment of the court the policy is to be construed as not covering the damage claimed, it be reformed so that it shall do so. The judgment of the court reformed the policy as prayed and awarded the plaintiff the sum demanded. The appeal is by the defendant from the judgment, and from an order denying its motion for a new trial.

As grounds for reversal of the judgment the appellant relies upon certain errors of law in the admission of evidence, and, principally, upon the proposition that the evidence in-

troduced showed no grounds for reformation, but disclosed
that the policy issued by the defendant to the plaintiff was
in accordance with the latter's application, and that it ad-
mittedly did not cover the loss sought to be recovered.

There is little contradiction in the evidence concerning the
main facts of the case, and it may be summarized as follows:

The defendant Commercial Union Assurance Company was
represented in Salinas by one Joseph Bordges, his appoint-
ment being made by the following letter written to him by
the defendant's manager:

"Dear Sir:

*"Automobile Insurance.*

"On the nomination of special agent, Mr. F. J. H. Man-
ning, you are hereby appointed agent of the Commercial
Union Assurance Co. L'd., for the transaction of automobile
insurance in Salinas, subject to such instructions as may be
given you from time to time by this office.

"The rate of your commission will be 15 per cent.

"Policies will be written at this office, and will be sent to
you promptly upon receipt of application.

"Yours truly,

"E. T. Niebling, Manager."

Bordges was supplied by the company with blank forms
of application and certain slips to be attached to them, ac-
cording to varying circumstances, called riders, one of which
was designated as Collision Clause E. The form of policy
issued by the company provided protection against certain
risks in the body of it, and if protection against additional
risks was desired one of these so-called riders would be at-
tached to the application, the two documents thus attached
constituting the demand for the insurance desired. These
riders were in fact identical in language with the slip at-
tached to the policy when issued, and which extended the
terms of the policy so as to cover the additional risk. Ap-
plications for insurance were required to be made on the
forms supplied by the company to its agent. Acting under
his letter of appointment Bordges received applications, for-
warded them to the company at its office in San Francisco,
which, if the risk applied for was accepted, issued a policy,
sent it to Bordges, who delivered it to the assured, collecting
the premium therefor. In May, 1912, the plaintiff Maxwell
Browne applied to Bordges for insurance on his automobile,
and Bordges proceeded in conjunction with Browne to fill

out the application. The insurance desired was that covered by the main body of defendant's automobile policy, and also against damage to plaintiff's car caused by direct collision, to cover which it was necessary to attach both to the application and the policy a rider known either as Collision Clause A or B. During the process of filling out the application form the question arose as to which rider it would be necessary to attach to it, and some discussion was had between Browne, Bordges, and a third person in the office of Bordges who carried a policy of automobile insurance. Bordges produced a form of rider known as Collision Clause E, the language of which, so far as it operated to designate the additional risk to be insured against over and above those provided for in the main body of the policy to be issued, is as follows:

*"Damage to property" Without Deduction.*

"In consideration of ——— dollars additional premium, this policy also covers sums which the assured shall become liable to pay for damage to property (excepting to the property of others while in charge of the assured or of the assured's employees) or for legal expenses incurred with the consent of this company in connection therewith, through collision of the automobile herein described with any other automobile, vehicle or object, either moving or stationary, during the period insured."

The meaning of this clause and its suitability to be attached to Browne's application in order to procure a policy affording him the protection he desired, was discussed by Browne and Bordges. It appeared to both of them to be ambiguous in its meaning, but in the opinion of Bordges it was the proper rider to be attached, although he was evidently uncertain. Browne, who, though not a practicing lawyer, had been admitted to the bar, and had had some former experience in connection with the insurance business other than automobile insurance, carefully read over Collision Clause E, and coincided with Bordges in his opinion that it was the correct rider to be attached to his application. On this subject Bordges testified: "Collision Clause E was examined by Mr. Browne at the time. He read it. We discussed the clause. Mr. Browne took part in that discussion. Mr. Browne expressed his opinion that this clause covered all the damage to the automobile. He thought the same as I did that that was the correct one. Browne after he had examined the

clause agreed that this Collision Clause E which is attached to the application was sufficient for the purposes we had in mind. I knew and he knew that when the policy came back from the San Francisco office it would carry the same sort of form as was attached to the application.''

Browne himself testified: ''He [Mr. Bordges] was not quite certain himself at first, and after reading it [collision clause E] over with Mr. Thorp and myself we all agreed that the language was sufficient to cover it.''

The application as thus prepared was signed by Bordges and Browne, and forwarded to the San Francisco office of the company, which thereupon issued a policy in accordance with the application, attaching to it the rider ''Collision Clause E,'' and the policy was delivered to Browne.

About a month thereafter Browne's automobile was injured by coming into collision with an obstacle in the road. He thereupon made a claim upon the company for his loss, and was informed by it that his policy did not cover such loss,— that Collision Clause E only covered liability on the part of the assured to pay for damages inflicted upon the property of others resulting from a collision with his automobile, and not protection to him for loss which he might sustain by reason of such collision with his vehicle. Browne called at the office of the company in San Francisco, and there saw and talked with both Niebling, the manager, and William Ireland, the secretary. There is some contradiction in the testimony as to the exact conversation between Ireland and Browne, and Niebling and Browne, upon this visit; but there is none as to the fact that the amount of the loss claimed by Browne ($35) was paid by the company, and that Browne was then unequivocally informed of the contention of the defendant that his policy did not' cover such a loss. Browne himself testified: ''In June or July, 1912, they said they were not liable 'for any such accident. . . . Mr. Niebling told me at that time that the policy did not cover that kind of a loss to my machine.'' Testifying as to what occurred during the negotiations for the settlement of this first loss Ireland stated: ''On the occasion of the first accident I told him that the policy did not cover damage to his own car; that if he wished to have damage to his own car covered he should have taken out Clause A or B . . . and pay the additional premium. . . . I showed him the riders which would be at-

tached, and explained to him what the additional premium would be—$120, in addition to the premium already shown on the policy.'' Ireland was present at an interview between Browne and Niebling, as to which he testified: ''I repeated to Mr. Niebling what I had told Browne. Mr. Niebling said that if Bordges told him (Browne) that the policy covered that affair that we would recognize it in that case as it was only a small claim. . . . We told Mr. Browne that future accidents of that sort would not be recognized. Mr. Browne said nothing in the way of assent. I remember Mr. Browne making this remark, that he understood our contention, and that he believed that that was the intention of the clause, but that it would not be sustained by the courts—that he had experience as an attorney. . . . Mr. Niebling finally told Mr. Browne that in view of the small loss in this accident at Colfax the company would stand that $35, but they would not stand anything further.''

Niebling, testifying to his interview with Browne, said: ''I said 'I am not going to get into a controversy with you over $35. As an *ex gratia* payment I will make this payment, and will not make any payment in the future.' . . . Mr. Ireland, in my presence, explained to Mr. Browne that there was a different rate of premium when one had a rider attached covering damages to his own machine.''

A. E. Field, an adjuster of the company who made the adjustment of this $35 loss, testified: ''I informed Browne in July, 1912, that the intent of the Collision Clause E was to indemnify the automobile owner against damage he might do to somebody else's property only, and that it was not intended to cover his own car.''

This matter being thus adjusted Browne took no step to either rescind his policy, or request the company to issue to him a new one which would without question insure him against damage to his automobile through direct collision; and matters remained in that condition when, in September of the same year, while being driven by himself, his automobile came into collision with another vehicle and was damaged to the extent of $1,350. He made claim upon the company for this amount, and was refused payment upon the ground that in the opinion of the company such a loss was not covered by the policy. Browne called on Mr. Niebling to urge his claim. In testifying as to this interview Mr.

Niebling said: "My second conversation with Browne was in September after the second accident. He came in and said he claimed an accident, and also quoted some of the statements Mr. Ireland made to him, and I told him, 'Mr. Browne, you recall very distinctly what I told you several months ago, that this clause did not cover this kind of damage, and that while I would make it *ex gratia* because it was too trifling an amount to get into a discussion about, you know perfectly well what I told you.' 'Well,' he said, 'I don't agree with you.' . . . When I told Browne to recall this previous conversation with him he did not deny that that was the previous conversation as I have stated. He merely denied that my conclusions were correct." This testimony of Niebling is not denied by Browne, except Browne does deny that Niebling told him that the company would not in the future recognize such a loss.

Upon the facts as thus testified to it is the contention of the appellant that the policy issued to Browne was the one he applied for; that it does not cover the loss sought to be recovered, and that, in any event, after the first accident and its settlement Browne, by retaining his policy and not offering to pay the additional premium chargeable upon a policy of the character claimed to have been requested of Bordges, is in no position to ask for reformation of his policy, and that the court erred in finding in favor of Browne and giving judgment in his favor.

In support of the judgment it is urged by the respondent that the foregoing facts establish that Bordges was authorized to enter into contracts of insurance binding upon the defendant; that it was the intention of the parties by their contract to insure plaintiff against the damage admitted to have been sustained by him, and that he having paid the premium demanded by the defendant, is entitled to have the policy reformed so as to cover such damage; and further, that the defendant by its action in recognizing and paying the first claim, and not at that time canceling the policy, is now estopped to deny that the policy covers the loss sought to be recovered. In urging this last contention the respondent lays stress upon an incident that occurred during the negotiations leading up to the settlement of the first loss. Ireland at that time had computed that the additional premium on the policy claimed by Browne to have been contracted for by

him would be $120, and so stated to the manager in the presence of Browne, whereupon, according to the testimony of the latter, Ireland said that if the company settled with him for that particular accident Browne would still owe the company money, to which Mr. Niebling replied, "No, he has paid all he was asked for, and he evidently did not get what he should have got."

We think it clear under the evidence that Bordges, the Salinas agent of the defendant, had no authority to make a binding contract of insurance; and that the general language of the letter appointing him as agent "for the transaction of automobile insurance" is to be construed in connection with the further language of the letter: "Policies will be written at this office," and with the conduct of the parties under it. There is no question in this case of ostensible agency; and the evidence as to what took place between Bordges and the plaintiff at the time of the application for the policy clearly shows that Bordges was doing nothing more than preparing the plaintiff's application for the purpose of forwarding it to the insurance company. The word "Written," in the phrase "Policies will be written at this office," evidently means something more than the mere physical act of filling in the blanks of an insurance policy. Insurance "written" is insurance contracted for. Consequently the consummation of the contract in controversy was dependent upon its ultimately being written at the general office in San Francisco. There was, therefore, no completed contract of insurance until the policy applied for was written and delivered; and it is settled that the authority to complete contracts primarily differentiates a general agent having power to bind his principal from mere soliciting agents and other intermediaries operating between the insured and the insurer, who have authority only to initiate contracts, and consequently cannot bind their principals by anything they may say or do during the preliminary negotiations (*Sharman* v. *Continental Ins. Co.*, 167 Cal. 117, [52 L. R. A. (N. S.) 670, 138 Pac. 708].)

As to whether the applicant for insurance would have any legal remedy against the company other than that of rescission of his contract upon discovering the mistake in his application it is not necessary in this case to determine, in view of the evidence which shows that upon discovering the mis-

take, and knowing that the defendant took the position that loss by direct collision was not covered by the policy, the plaintiff nevertheless elected to retain it, and neither requested the defendant to issue to him a different policy, nor offered to pay the premium requisite to insure against the risk which he claimed to have applied to be covered in the first place. By so doing he accepted the policy issued to him as complying with his application for insurance (*Bostwick* v. *Mutual Life Ins. Co.*, 116 Wis. 392, [67 L. R. A. 705, 89 N. W. 538, 540, 92 N. W. 247] ; *Plympton* v. *Dunn*, 148 Mass. 523, [20 N. E. 180] ; *Madsen* v. *Maryland Casualty Co.*, 168 Cal. 204, [142 Pac. 51].) We cannot distinguish such a case from that where a person ordering goods of a particular kind, his vendor sends him goods of a different kind, and the purchaser after discovering the mistake elects to retain the goods delivered, and pays no more than the price of those goods.

The respondent seeks to escape the effect of his inaction by the contention that he was justified, by the answer made by defendant's manager to Mr. Ireland above quoted, to wit, "No, he has paid all he was asked for, but he evidently did not get what he should have got,"—in assuming that the company would in the future recognize liability for losses by direct collision as included within the plaintiff's policy. We think that no such inference can be drawn from the language used by Niebling. It was a remark addressed not to the plaintiff (although in his hearing), but to an officer of the company; and it was not made in reply to any offer of the plaintiff to pay the increased premium. It cannot be segregated from the remainder of the evidence concerning the discussion of which it was a part, and considered alone. It was Niebling's contention, known to the plaintiff, that the policy did not cover the loss for which claim had been made. The claim was for a small amount; and nothing was more natural than that the manager of the company, recognizing that the plaintiff had been misled by the company's agent into applying for a policy different from the one he desired, should be willing to make plaintiff whole up to that time without additional charge; but no inference could properly be drawn therefrom that he was willing that such losses should be recognized in the future now that Browne no longer labored under any misapprehension or mistake. The true reason for the plaintiff's inaction suggested by the evidence

is rather that he was still of the opinion that his policy covered the character of loss in dispute, and that if the question ever came to be litigated the courts would sustain his view. The circumstances attending the settlement by the company of Browne's first loss are entirely insufficient to constitute an estoppel as against the defendant, nor was such an estoppel an issue in the case.

For the reasons above set forth we are of the opinion that the findings of the court in favor of the plaintiff are not supported by the evidence, and that it erred in holding that the policy of insurance sued upon should be reformed, that the defendant was estopped to deny that it was liable for the amount claimed by plaintiff, and in giving judgment in his favor.

The judgment and order are reversed.

Richards, J., and Kerrigan, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on July 20, 1916.