MITCHELL STREET STATE BANK, Respondent, vs. SCHAEFER, Appellant.

*May 31—June 25, 1919.*

*Banks and banking: Acts of cashier: Individual interest: Authority: Receiving bonds as collateral.*

1. One who borrowed money from a bank on his notes in order to purchase bonds of a corporation in which he was a stockholder is entitled to rely on statements of the cashier (who was also a stockholder and trustee of the corporation) that the bank would sell the bonds and apply the proceeds in payment of the notes, for which the bonds would be held as collateral, and is not responsible for the conversion of the bonds by the cashier, the acts and declarations of the cashier being those of the bank.
2. The cashier had full authority to receive such bonds as collateral on behalf of the bank for notes given to it, where as stockholder and trustee his only interest in the matter was to get par value for the bonds of his corporation. This having been accomplished, he had no further interest, and his acts bind the bank.

APPEAL from a judgment of the circuit court for Milwaukee county: LAWRENCE W. HALSEY, Circuit Judge. *Reversed.*

Action upon two promissory notes of $5,000 each given by the defendant to the plaintiff bank. The defendant by answer and counterclaim alleges that he deposited with the

bank as collateral security for the notes $10,000 worth of bonds executed by the Wisconsin Mausoleum Company, and that the bank had converted the same.    The plaintiff's reply denied the allegations of the counterclaim.

The facts were these: In April, 1913, one Edgerton was vice-president, cashier, and active manager of the plaintiff bank; he was also a stockholder in the Wisconsin Mausoleum Company, a corporation then engaged in constructing a community mausoleum in Milwaukee.    The defendant *Schaefer* was also a stockholder in the Mausoleum Company and treasurer thereof.    The Mausoleum Company, in order to raise funds for its building, put out a bond issue of $40,000 in 1912, secured by a trust deed, and sold the bonds to Edgerton at ninety-three per cent. of their par value on his agreement to pay for them by furnishing the moneys necessary to complete the building.    These bonds were guaranteed by defendant *Schaefer* and two others.    They were to be paid by the sale of crypts, the sum of $150 being agreed to be turned over to Edgerton on the sale of each crypt.    The defendant was the contractor who furnished the marble and granite work for the mausoleum, and a considerable part of the moneys realized from the bonds was to be used to pay amounts due him.    In April, 1913, Edgerton had disposed of $30,000 worth, par value, of the bonds to the plaintiff bank, but more cash was needed and Edgerton called *Schaefer* to the bank and told him that more money was needed.    *Schaefer* states that in this interview Edgerton said in substance, "We are short of money; the bank don't want to carry any more of these bonds on account of objection that might be . made by the bank examiner; we want you to give a note of $5,000 to the bank and we will sell you $5,000 of these bonds and you leave them with the bank as collateral security for your note, and if the bank can sell the bonds it will do so and redeem the note, and it will only be a short time before they will all be sold."    *Schaefer* further testified that he then signed the note; that Edgerton went into another room and

got the bonds, and put the bonds and note together in an envelope and said, "These will have to be left with the bank." The bank then credited the mausoleum account with the $5,000 and the money was drawn out to pay bills for labor and materials used in the building by checks signed by *Schaefer* as treasurer.   Some time later Edgerton called *Schaefer* to the bank again and told him more money was needed, and *Schaefer* executed a second note for $5,000 and put up another $5,000 worth of bonds as collateral under practically the same circumstances as stated with regard to the first $5,000.   Edgerton was not produced as a witness and *Schaefer's* testimony as to the two transactions is undisputed.   The notes were renewed from time to time.   Interest appears to have been paid by the Mausoleum Company, but when the notes in suit became due in March, 1915, the defendant refused to renew them again and asked Edgerton to sell the bonds, and Edgerton after some talk stated that he had taken the bonds to Waukesha and borrowed $5,000 on them.   It is undisputed that the bonds were and are worth par.   They never were returned nor accounted for, so far as the evidence shows, and the position of the bank in this action is that they never came into possession of the bank either actually or constructively, but were retained and used by Edgerton personally.   The trial court directed a verdict for the defendant for the amount of the notes and interest, and from judgment on the verdict the defendant appealed.

The cause was submitted for the appellant on the brief of *Van Dyke, Shaw, Muskat & Van Dyke* of Milwaukee, and for the respondent on that of *Flanders, Fawsett & Smart* of Milwaukee.

WINSLOW, C. J.   It seems plain to us that a verdict for the defendant should have been directed in this case.   A man acting in good faith is entitled to deal with the cashier of a bank in the usual course of banking business in entire confidence that the acts and statements of the cashier in the course

of such dealing are in legal effect the acts and statements of the bank.

The defendant here was dealing with the bank acting through its cashier and manager. He proposed to borrow $5,000 from the bank on his note, loan the amount to a business corporation in which he was interested (receiving from the cashier, who was also a trustee of the corporation, $5,000 worth of its trust-deed bonds for his loan), and to deposit the bonds with the bank as collateral security for his note, with the understanding that the bank should sell the bonds as soon as possible and apply the proceeds to the payment of the note.

There was nothing in this outside of the usual course of the banking business; such transactions are occurring every day, and we think the business public would be greatly surprised to know that in such a transaction the acts and declarations of the cashier were not binding on the bank. Were it otherwise there would be no safety in dealing with any banking official or officials short of the board of directors in regular meeting assembled.

When, in the present case, the cashier, after producing the bonds which he held as trustee up to that time, accepted the defendant's note to the bank and informed him that the bonds would remain with the bank as collateral security for the note, the transaction was closed, the bonds had in legal effect passed into the possession of the bank as completely as if they had been placed in the vault, and the defendant was not obliged to see that the cashier did not thereafter convert them to his own use.

It is argued that the defendant could not treat the statements of Edgerton as the statements of the bank because he knew that he (Edgerton) had a personal interest in the transaction apart from his interest or duty as an officer of the bank; but it is only when the statement is made in the agent's own interest and against the interest of his principal, to the knowledge of the party with whom the agent is dealing, that this exception to the general rule applies.

There was no such case here. Edgerton's personal interest in the transaction as stockholder and trustee was simply to get par value for the company's bonds. That having been accomplished, he had no further legitimate personal interest in the matter, and hence no interest contrary to the interests of the bank or adverse to the hypothecation of the bonds with the bank to secure the defendant's note. As cashier he had full authority to receive the bonds as collateral on behalf of the bank, and he assumed to exercise that authority and thereby bound the bank. The defendant was entitled to rely upon his acts as the acts of the bank, and cannot be held responsible for his subsequent breach of duty to the bank in converting the bonds to his own use. *First Nat. Bank v. Sing Sing G. M. Co.* 120 App. Div. 542, 104 N. Y. Supp. 1040, affirmed 194 N. Y. 580.

This view of the case renders it unnecessary to treat any other questions. It being undisputed that the bonds have been converted and that they were worth par, the counterclaim offsets the amount due on the notes.

*By the Court.*—Judgment reversed, and action remanded with directions to enter judgment dismissing the complaint.