[Civ. No. 12950. First Dist., Div. One. Aug. 1, 1946.]

FRANK HENRY DUARTE et al., Respondents, v. POSTAL UNION LIFE INSURANCE COMPANY (a Corporation), Appellant.

Walker, Adams & Duque, Aiken, Kramer, Aiken & Baer, Markell C. Baer and Irving M. Walker for Appellant.

William H. Hollander, Jesse G. Benson, Lewis E. Lercara and Alfred C. Skaife for Respondents.

SCHOTTKY, J. pro tem.—Plaintiffs, Frank H. Duarte and Helen Hill Duarte, his wife, brought an action against defendant, Postal Union Life Insurance Company, to recover the sum of $23,368, plus interest. The complaint was based upon two so-called binding receipts dated March 14, 1935, executed by one Green as the agent of defendant, by the terms of which receipts defendant agreed to issue to plaintiffs single premium fully paid two-year endowment insurance policies in the aggregate amount of $23,368, or to return to plaintiffs the premiums paid. Plaintiffs seek the return of said sums because the endowment policies were not issued. The answer of defendant denied all of the material allegations of the complaint, including the allegation that Green was acting as the agent of defendant and also set forth affirmative allegations and defenses to which reference will hereafter be made. The cause was tried before the court without a jury, and judgment was entered in favor of plaintiffs for $15,077.51, being the sum of $9,207 with interest at 7 per cent from March 14, 1935, the date of the receipts, to January 11, 1945, the date of the judgment. This is an appeal from the judgment and from the order denying defendant's motion for a new trial.

The fourth amended complaint was based upon the binding receipts which recite that Frank H. Duarte in one cause of action, and Helen Hill Duarte in the other, have paid certain sums of money in connection with applications to defendant Postal Union Life Insurance Company for the issuance by that company of certain insurance policies. It is alleged that the sum of $13,368 was paid by Mr. Duarte and the sum of $10,000 by Mrs. Duarte, which sums were full premiums for the policies to be issued. The receipts were attached to the complaints as exhibits and each contained a provision that "If the Company declines to issue the insurance applied for, the consideration received will be returned on surrender of this receipt."

Each receipt was signed by "H. B. Green, Agent." The complaint alleged that H. B. Green was a life insurance agent

of defendant, duly licensed under the provisions of section 633a of the Political Code; that he executed the receipts and received from plaintiffs sums aggregating $23,368, and that he was acting within the scope of his authority as agent. The complaint further alleges that plaintiffs did everything that was required to be done by them under the provisions of said receipts, that they have at all times been ready, willing and able to surrender said receipts to defendant upon payment to them of the sum referred to in the receipts, but that the defendant has failed to deliver the insurance policies and has failed to make repayment of the sums referred to in the receipts.

Defendant in its answer denies that either of the plaintiffs paid any money or consideration to it, or that Green, acting as agent of the defendant, received any money or other consideration from plaintiffs or executed the receipts. Defendant further denies that plaintiffs have performed the things to be done by them or that plaintiffs have been ready or able to surrender the receipts. Defendant further denies that it has failed or refused to issue the policies of life insurance and alleges that it has never received any applications or premiums therefor. Defendant then alleges that Green, Bouer and Malone, doing business as Postal Underwriters, Inc., with intent to defraud plaintiffs, and without the knowledge of defendant, induced plaintiffs to deliver to them Mercantile Building and Loan certificates of the face value of $23,368, and of the market value of $9,759.91; that Green, Bouer and Malone sold these certificates for $9,759.91 and retained the money to their own use; that Green, Bouer and Malone did not intend that plaintiffs should receive the life insurance policies or the repayment of the money and that subsequently plaintiffs caused the arrest and prosecution of the three for embezzlement and grand theft of said certificates with the result that they were convicted and sentenced to San Quentin.

Defendant in its 29 page answer also sets up numerous affirmative defenses. The substance of these is that the agreement or agreements that plaintiffs entered into with Green were without the authority or knowledge of defendant; that defendant received no consideration from plaintiffs and that said agreements were for the sole benefit of plaintiffs, Green and Postal Underwriters, Inc.; that plaintiffs received four payments of $210.31 each and 976 shares of stock of defendant under said agreement; that said purported agreement

was ultra vires, against public policy, and in violation of the Insurance Code; that said action was barred by subdivision 1 of section 339 of the Code of Civil Procedure.

The court found in substance as follows:

That on March 14, 1935, plaintiffs assigned to defendant investment certificates of the face value of $23,368 and of the market value of $10,048.24; that this assignment was made pursuant to the agreements evidenced by Exhibit "A" and Exhibit "B" attached to the fourth amended complaint, —that is to say, the receipts delivered by Green to plaintiffs and signed "H. B. Green, Agent"; that the defendant did not issue the life insurance policies to plaintiffs and that plaintiffs had offered to surrender the receipts.

That Green was a life insurance agent of defendant; that as such agent, and acting within the scope of his authority, he received the certificates and executed the receipts; that plaintiffs fully performed all things required of them under the provisions of the receipts and offered to return the receipts to defendant upon the return to plaintiffs of the consideration delivered by plaintiffs, but defendant had failed and refused to return such consideration or its money equivalent.

That the policies called for by said receipts were fully paid up policies in the respective sums of $13,368 and $10,000; that due demand had been made upon defendant and there was due from defendant to plaintiff the market value of the certificates, to wit, the sum of $10,048.24.

In connection with Paragraph IV of the amended answer to the fourth amended complaint, it found that Green, Bouer and Malone, with intent to defraud plaintiffs, induced plaintiffs to deliver to them the certificates; that Green sold the certificates and delivered the proceeds to Underwriters; that Underwriters was the alter ego of defendant; that Underwriters was the duly authorized agent of defendant to receive "said funds"; that the acts of Green, Bouer and Malone were "with the consent and knowledge of the defendant through its officers and agents"; that Green, Bouer and Malone never intended that plaintiffs should receive life insurance policies or the repayment of money as promised; that Green, Bouer and Malone were indicted and convicted on fifteen charges of grand theft and embezzlement in fifteen transactions identical in form involving the purchase of passbooks (certificates); that defendant received the original

applications for insurance in connection with which the receipts were issued; that defendant received premiums and considerations for the issuance of such insurance policies through the receipt by Green and Underwriters of the certificates and the money for which the certificates were sold; that on the 25th day of May, 1935, and at all times subsequent thereto defendant refused to issue the policies of insurance referred to in the receipts and that each of the plaintiffs had little education and that Mrs. Duarte was impaired in her hearing.

That plaintiffs transferred the certificates to defendant under and pursuant to the written agreement evidenced by the receipts; that such receipts were executed with the authority, knowledge and consent of defendant and were ratified and confirmed by it.

That, in addition to the promises of defendant contained in the receipts, Green agreed that the defendant would pay plaintiffs 90 per cent of the face value of their certificates; that said sum would be paid in monthly payments of 1 per cent for a period of two years and the balance at the end of two years, and that said payments would be secured by the life insurance policies called for by the receipts.

That there was ''no novation and no new agreement'' on the 14th day of April, 1935; that Green never intended that plaintiffs should receive the insurance policies referred to in the receipts; that plaintiffs did not discover ''said fraud . . . until the end of April or in May of 1936, when defendant sent premium notices to plaintiffs''; that the repurchase contract was executed by plaintiffs but was part of a design on the part of defendant to mislead plaintiffs and obtain their certificates; that said repurchase contract is signed by Underwriters, the alter ego of defendant; that plaintiffs did not know until 1936 that defendant and Underwriters were not one and the same corporation; that Green on April 14, 1935, delivered to plaintiffs 976 shares of the stock of defendant but said stock was the personally owned stock of B. D. Malone; that said stock was subsequently stolen from plaintiffs by their attorney, one Lenahan; that its transfer from Malone to plaintiffs did not cause defendant any loss; that said stock did not have a value in excess of about $3.00 per share; that as part of the scheme of defendant to defraud plaintiffs, Green on April 14, 1935, took plaintiffs' application for policies in the respective amounts of $15,000 and

$6,000; that such policies were delivered but were "void documents" because the first premiums had not been paid; that the delivery of these policies was calculated by defendant to, and did, cause plaintiffs to believe until May of 1936 that they had received fully paid two-year endowment policies as promised; that plaintiffs received four monthly payments of $210.31 from Underwriters and should account therefor; that the terms of the repurchase agreement have never been carried out by Underwriters except as to the payments aforesaid; that there was a settlement of all affairs between Underwriters and defendant and mutual releases executed between them.

That in addition to the authorization contained in his written agency contract Green was authorized by Malone, the general manager of defendant, to and and he did make with various persons over a period of one and one-half years the same type of transaction that he made with plaintiffs and it was on fifteen of these similar transactions that Green, Malone and Bouer were convicted of grand theft and embezzlement.

That Green inserted in the receipts the word "full" in place of the word "first" but was authorized by defendant to do so; that defendant and Green had, or should have had, full knowledge of insurance laws, rules and regulations but plaintiffs did not have; that plaintiffs did know that they could not withdraw money on their certificates and that Mercantile Building & Loan Association was in default in the payment of interest; that the premium ordinarily required for the policies called for by the receipts was $22,548.85, which fact was known to defendant but unknown to plaintiffs.

That the causes of action stated in the fourth amended complaint are not barred by subdivision 1, section 339 of the Code of Civil Procedure.

That B. D. Malone was the general manager of defendant and had full power and authority to do each of the acts mentioned in the findings.

Defendant in its 100 page opening brief makes numerous contentions, chief among which is a vigorous and forceful attack upon the sufficiency of the evidence to support the judgment. Before discussing the specific contentions of defendant it is well to quote from *Juchert* v. *California Water Service Co.*, 16 Cal.2d 500 [106 P.2d 886], where our Supreme Court said at page 503: "As is always true on such appeals,

all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences must be indulged in to uphold the verdict, if possible. It is elementary that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. And when two or more inferences can reasonably be deduced from the facts, the reviewing court is without power to substitute its deductions for those of the jury or trial court. (*Crawford* v. *Southern Pacific Co.*, 3 Cal.2d 427 [45 P.2d 183]; *Treadwell* v. *Nickel*, 194 Cal. 243 [228 P. 25]; *Bancroft-Whitney Co.* v. *McHugh*, 166 Cal. 140 [134 P. 1157]; *Wing* v. *Kishi*, 92 Cal.App. 495 [268 P. 483].)''

With this familiar and well settled rule in mind, we shall summarize briefly the factual situation as shown by the record in this case and the inferences which may reasonably be drawn therefrom.

Plaintiffs are husband and wife, and at the time here involved were of the ages of 51 and 53 respectively. The wife's hearing was impaired, and the court found that they were both of little education. The husband was a mechanic and they operated a garage at Livermore.

Defendant is a legal reserve life insurance company. Early in November, 1934, B. D. Malone and F. J. Bouer acquired the stock of defendant, and on November 10, 1934, B. D. Malone was made general manager and given ''general supervision, direction and control of the business'' of defendant (rep. tr. p. 443). Malone continued to be general manager until November 29, 1935, and Bouer was a member of the board of directors until December 29, 1934. It is a fair deduction from the record that Malone and Bouer completely controlled and dominated the affairs of defendant during the time that Malone was general manager.

Early in December, 1934, Malone and Bouer incorporated the Postal Underwriters, Inc., but said corporation never held any organization meeting or elected any officers, but was formed to work in conjunction with the handling of the business of the defendant Postal Union Life Insurance Company, which Bouer and Malone owned and controlled. So close was the connection between the defendant Postal Union Life Insurance Company and the Postal Underwriters, Inc., (hereinafter referred to as ''Underwriters'') that as found by the

court and supported by the record, the office of Underwriters was a room in the building owned by defendant; its vice-president, T. J. Olsen, was in the employ of and paid by defendant; an employee of defendant received its mail; and its secretary and bookkeeper was the private secretary of B. D. Malone, general manager of defendant. Underwriters had an insurance agency contract from defendant. It acquired the business of Empire Securities Company (which had had an insurance agency with defendant) and assumed its obligations, including its obligation to defendant for the premiums on the single-premium endowment policies which had been written by Green through Empire Securities. Green became an employee of defendant on December 7, 1934, at a salary of $50 a week, and continued as such employee to May 31, 1935. He was employed as an insurance solicitor under a written contract and also as a ''General Representative'' in which latter capacity his duties consisted of finding agents who would solicit applications for insurance.

In December of 1934 the Insurance Department of the state told William A. Munster, the actuary of the defendant, who had charge of passing on applications for insurance and collecting premiums, that no more of the single-premium endowment policies were to be written by defendant, and that the defendant must promptly collect the premiums on such policies as had been written and in connection with which the premiums had not been paid over to defendant by Empire Securities.

About December 15, 1934, Bouer told Green the Insurance Department was insisting that some $48,000 of 2-year endowment policies which Green had placed in Monterey County had to be removed as Postal Union obligations. Bouer asked Green to go out and exchange stock of the defendant for these policies, and asked him if he could exchange notes or contracts of Underwriters secured by Postal Union stock for these policies. In February, 1935, Malone confirmed Bouer's instructions and told Green to sell Underwriters' contracts and take life insurance on the purchaser of these contracts for the contract amount. Green was told to give the purchaser a ''binding receipt'' of defendant for the face amount of the policy until the contract with Underwriters was signed, and then to pick up the receipt.

Sometime in February, 1935, Green called on plaintiffs. They testified that they were the owners of pass-book certificates in the sums of $13,368 and $10,000 respectively, and

that Green introduced himself as a "special representative" of the defendant, showing to plaintiffs cards and letters which had been furnished to him by defendant, and told plaintiffs that defendant was prepared to purchase their certificates for 90 cents on the' dollar; that Green offered to give them fully paid up insurance policies for the amount stated in the pass-books, and "a contract that would pay us one per cent per month, and to run for two years" and "at the end of the two years, this full amount of our face value—of our 90% of our face value. . . ." Green urged plaintiffs to inquire of the Insurance Commissioner about the financial standing of defendant, which Mrs. Duarte did, and was told that it was "sound." On or about March 14, 1935, plaintiffs accepted the offer, and endorsed in blank and handed to Green their ·certificates. At the same time Green gave plaintiffs the binding receipts, which stated that the full premium had been paid (which was the same amount as the face value of the pass-books) ; that if the policies were not written, plaintiffs, upon surrender of the receipts, were to receive back the consideration which they had given to secure the policies. There was nothing in the receipts showing what type of policy was to be issued. At the same time plaintiffs signed applications for the insurance. The applications never came to the attention of Munster, the actuary for defendant. The certificates were immediately sold by Green when he received them from plaintiffs for $9,759.91. Green retained $283 and turned over the balance to Underwriters.

On March 22, 1935, plaintiffs sent defendant a wire to the effect that Green had not returned with the two policies. Munster wrote Bouer that defendant had not received the applications, and, receiving no answer from Bouer, referred the matter to Malone, who told Munster the applications "would be coming in."

On April 14, 1935, Green delivered to plaintiffs 976 shares of stock of the defendant company, issued in the names of plaintiffs, which belonged to Malone and Bouer. At the same time a contract, which had been signed by Underwriters, was executed by plaintiffs, whereby Underwriters agreed to purchase the 976 shares of defendant's stock, and to pay 24 monthly payments of $210.31 each, and a final payment, that would bring the total payment to 90 per cent of the face value of plaintiffs' certificates. Early in May, 1935, Green told plaintiffs that defendant did not wish to write so much in-

surance on Mrs. Duarte, and that they would write $15,000 on Mr. Duarte and $6,000 on Mrs. Duarte. New applications were made out for policies in these amounts, but they were for 31 annual premium policies. The old receipts were not taken up. On May 9, 1935, plaintiffs executed to Underwriters an assignment of the insurance policies to be issued under the second applications. That same month defendant issued the policies to plaintiffs; and on May 18, 1935, Munster forwarded the policies to Underwriters, with a letter stating that definite arrangement for premium payments should be made before releasing the policies to Green. The plaintiffs received the policies, and signed receipts for them, but no demand was made upon them for payment of the premiums on said policies. Between April and September, 1935, plaintiffs received four of the monthly payments of $210.31 from Underwriters provided for in the repurchase contract, but early in 1936 plaintiffs wrote defendant saying that they needed their money. Munster replied that the check which they wrote about was not due from defendant, that their letter should have been addressed to Underwriters, which was a different company, and that their letter had been turned over to Underwriters. He also informed them that their premiums on the insurance policies which had been issued to them had not been paid, and that under the circumstances the assignments were not effective. On February 3, 1936, plaintiffs wrote Underwriters requesting it to pay the delinquent installments due under the re-purchase contract. About May 1, 1936, plaintiffs received notice of the annual premium due on their policies, and they replied that their policies were paid up policies. Munster answered that plaintiffs' policies were not in force because no premium had been paid. This action followed, to compel the return of the consideration, under the terms of the "binding receipts."

Other facts shown by the record will be set forth in our discussion of the various contentions. Defendant's first contention is that there is a fatal variance between the allegations of plaintiffs' complaint and the proof. Defendant argues that the record does not show that the certificates were given in consideration of the receipts, but does show that there was a contract for the sale by plaintiffs and a purchase by Green of plaintiffs' certificates at a price of 90 per cent of the face value of the certificates; that the certificates were not delivered primarily for the purpose of securing or as consideration for

any insurance policies; that the insurance policies were a mere incident of the transaction between plaintiffs and Green; that by the subsequent assignments to Underwriters of the policies which were issued, which assignments were made without plaintiffs receiving any explanation as to why they were to be made, it is obvious that plaintiffs intended to part with all title to the insurance policies and that plaintiffs looked to the repurchase contract with Underwriters as the source of the payment of the purchase price of their certificates. In other words, defendant contends that the proof showed that plaintiffs surrendered their certificates in order to secure the payments promised by the repurchase contract, and that *that* contract was the consideration for the delivery of their certificates to Green; and that therefore there was a fatal variance in the pleadings (which alleged that the certificates were given as consideration for the receipts) and the proof (which defendant claims showed that the certificates were given in consideration for the repurchase contract); also that the court's finding that the certificates were given in consideration for the receipts is, for the same reason, not in conformity with the proof.

If we were compelled by the record to conclude that the evidence could be given no other construction than the one defendant has given it, we might agree with this contention. However, under the familiar rule as to the function of an appellate tribunal, all conflicts must be resolved in favor of a respondent and all reasonable and legitimate inferences must be indulged in to support a finding or judgment. The allegation in the complaint is supported by the testimony of Mr. Duarte, who testified that Green said "he was authorized to offer us 90 per cent of the face value of these books, *and in return* give us a policy for my wife, in the amount of $10,000, and one for myself in the amount of $13,000, payable in two years,—a fully paid up policy in two years''; that on March 14, 1935, they turned over their pass-books to Green and received the "binding receipts" in return; that "that was the receipts we were given for our pass-books''; and that the "binding receipts" were attached to the applications for the insurance. It was not until a month later that the transaction took place about the stock, and then only after plaintiffs had complained to defendant that they had not received their policies. (Italics added.)

As pointed out by plaintiffs, section 469 of the Code of

Civil Procedure provides that "No variance between the allegation in a pleading and the proof is to be deemed material, unless it has actually misled the adverse party to his prejudice in maintaining his action or defense upon the merits," and the voluminous answer containing numerous special defenses filed by defendant shows that defendant could not have been misled or prejudiced by the allegations of the complaint.

■ Furthermore, where, as here, the trial of a case has occupied many days and all the issues appear to have been understood by the parties, an appellate tribunal is not inclined to decide the matter upon a technical question of pleading. We are mindful of section 4½ of article VI of our state Constitution which provides that "No judgment shall be set aside, or new trial granted, in any case, on the ground of . . . improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."

■ Defendant's second contention is that the findings that Green was the agent of defendant and acted within the scope of his authority in his transactions with plaintiffs is without support in the evidence.

The court found that Green was a life insurance agent of defendant, and that, acting within the scope of his authority, he received the certificates from plaintiffs and executed the binding receipts upon which plaintiffs' action is based. Defendant contends that this finding is not supported by the evidence; that the evidence shows that Green was acting outside his authority; that Green did not derive his authority to act for the defendant under his written contract, because this contract stated the types of policies Green was entitled to solicit and it did not include the single-premium endowment policies; furthermore, that after the Insurance Department told the company it was not to write any more single-premium endowment policies, it ceased to do so, and that Bouer instructed Green, in December, 1934, that he was not to take any applications for single-premium endowment policies. Therefore, defendant contends that Green was acting absolutely outside his authority in giving "binding receipts" covering this type of policy.

Furthermore, defendant argues that the employment of

Green as a "special representative" did not authorize him to act for defendant in these transactions, because it is uncontradicted that his duties under this employment consisted solely of finding agents who would solicit applications for insurance.

Defendant also contends that the instructions received by Green from Bouer and Malone—to "see about raising the money (needed to complete a contemplated merger) anyway—pass-books, securities, cash . . ." and to sell Underwriters' contracts and take out insurance on the purchaser, give the purchaser a binding receipt and pick it up when the purchaser signed the contract—did not authorize Green to act for the defendant; that the defendant would derive no benefit therefrom, but would lose the insurance when the receipt was picked up; but that such a transaction would benefit Underwriters, and that therefore the instructions must have been given for the benefit of Underwriters, and not defendant.

Plaintiffs argue that it was not material that defendant should have obtained any benefit from the transactions, but that, in any event, the evidence shows that on December 18, 1935, all of the obligations of Underwriters to the defendant and the obligations of the defendant to Underwriters were cancelled and released from each to the other, and that thereby defendant received as a result of the pass-book transaction $21,000 in cash and obtained practically all of the assets of Underwriters, which included the sum realized from the sale of the pass-books obtained from the plaintiffs.

Defendant also contends that the binding receipts themselves contained the provision that the receipt would not be valid for any purpose if any erasures or additions were made, and that where the printed receipt read "Received . . . the first premium," Green had crossed out the word "first" and written in the word "full."

Plaintiffs contend that an examination of the photostatic copy of the "binding receipt," which appears in their brief, will show that the crossing out of "first" and inserting the word "full" did not constitute an alteration within the meaning of section 1700 of the Civil Code, because it did not change the legal effect thereof; that the meaning of the words "full" and "first" in this instance is exactly the same, in view of the fact that there was only one premium contemplated.

Defendant argues, also, that the applications which were

signed by plaintiffs for the policies they did not receive, as well as the policies issued to and received by plaintiffs, plainly stated that no statements or promises made by the person soliciting the policy should be binding on the company unless reduced to writing, and that therefore plaintiffs were clearly informed that Green had no authority to act for defendant in such a transaction.

Defendant cites *Toth* v. *Metropolitan Life Insurance Co.*, 123 Cal. App. 185 [11 P.2d 94], in support of the proposition that under Green's contract of employment he had no authority to bind defendant to issue the 2-year endowment policies. It was there held that a mere soliciting agent had no authority to enter into a parol contract of insurance; also that where an applicant signed a written application which expressly provided that the soliciting agent had no right or authority to bind the company by any promises or purported oral agreements, the agent had neither actual nor ostensible authority to make a purported oral contract of insurance. The court said at pages 192, 193: "Defendant had the right to thus limit the authority of its soliciting agents and such a limitation of authority has been frequently upheld in this state. (*Iverson* v. *Metropolitan Life Ins. Co.*, 151 Cal. 746, 751 [13 L.R.A.N.S. 866, 91 P. 609]; 14 Cal.Jur., p. 460.) A mere soliciting agent or other intermediary operating between the insured and the insurer has authority only to initiate contracts, but not to consummate them, and cannot bind his principal by anything he may say or do during the preliminary negotiations. (14 Cal.Jur. p. 457; *Browne* v. *Commercial Union Assur. Co.*, 30 Cal.App. 547, 554 [158 P. 765]; *Sharman* v. *Continental Ins. Co.*, 167 Cal. 117, 124 [52 L.R.A.N.S. 670, 138 P. 708].) The evidence in the case at bar shows without contradiction that Thomas was only a soliciting agent. He therefore had no authority to make any contract of insurance, either oral or written; and, even if we assume that he attempted to make an oral contract to insure decedent, his lack of authority so to do would prevent such purported oral contract from being valid or effective. . . . Thomas, therefore, had neither actual nor ostensible authority to make the purported oral contract relied upon by appellant and consequently no completed contract of insurance on the life of the decedent, either oral or written, was ever entered into by decedent and defendant. An insurer is not bound by representations or purported agreements made by an unau-

thorized agent. (14 Cal.Jur. p. 458; *Fidelity & Cas. Co.* v. *Fresno Flume & Irr. Co., supra* [161 Cal. 466 (119 P. 646, 37 L.R.A.N.S. 322)].)''

Plaintiffs do not question the rule laid down in the Toth case, but plaintiffs contend that said rule is only applicable to the instant case if the factual situation pictured by defendant is the only one that can be sustained by the record. Plaintiffs argue that the record supports the finding that Green was the agent of defendant and acted within the scope of his authority in the transaction with plaintiffs.

We believe that it may fairly be inferred from the evidence that Malone and Bouer were in complete charge of defendant corporation and that they instructed and authorized Green to accept the building and loan certificates of plaintiffs and to issue to them the binding receipts upon which the action is based. There is, therefore, in this case no question of an agent violating his instructions or exceeding his authority, but it is a case in which the agent is merely carrying out the instructions of those in charge of the affairs of defendant corporation. Under such circumstances the type of written contract that Green had with defendant corporation would not be controlling when it is clear from the record that he was given the instructions under which he had acted in his dealings with plaintiffs by Malone and Bouer, who were in charge of the corporation.

Defendant argues further that Malone would have no power to authorize Green to enter into such an agreement with plaintiffs on behalf of the corporation because as general manager he could not authorize any act outside the usual course of business and beyond the powers usually reposed in general managers. However, the record shows that on November 10, 1934, Malone was made general manager and given ''general supervision, direction and control of the business'' of defendant and was given power to ''employ and discharge employees, contract with and in all other respects deal in and with persons and properties of this Corporation as the best interests of this Corporation and the new management thereof shall require.'' It is evident from the manner in which the affairs of defendant were conducted from that time on that the directors of defendant corporation and Malone interpreted this resolution to mean that Malone was to be in full and complete charge of all of the affairs of the corporation. It must be borne in mind that the defendant corporation was

then in difficulties, that Malone and Bouer had acquired practically all of its stock and that thereupon the then general manager, Sam Sadowski, was replaced by Malone, and that from that time until November 29, 1935, Malone was in complete control of defendant corporation, and with the aid of Bouer directed and dominated the affairs of defendant corporation and the actions of the employees thereof. As part of that management and control Malone and Bouer organized the Underwriters, which corporation, it may fairly be inferred from the evidence, was controlled, used, managed and manipulated by Malone and Bouer in connection with and as part of their management of defendant Postal Union Life Insurance Company. Under instructions from Malone and Bouer, Green went to plaintiffs and secured their building and loan certificates by promising them a fully paid insurance policy, as evidenced by the binding receipts. The fact that such an agreement could not properly be made by an insurance company under the Insurance Code does not refute the fact that Malone as general manager did instruct and authorize Green to make such agreement with plaintiffs, nor does it relieve defendant from the obligation to return to plaintiffs the consideration received, upon the failure to deliver to plaintiffs the policies called for in said binding receipts.

Defendant also argues that it did not adopt or ratify the contract made by Green nor was Malone's knowledge of the transaction chargeable to defendant, and defendant cites cases on the question of "imputation of knowledge." However, from what we have heretofore stated as to the domination and control of defendant by Malone, it is unnecessary to discuss this contention, as we are unable to understand how defendant can escape liability for the acts of Malone whom the directors placed in full charge of the affairs of defendant corporation.

As is said in the case of *Rutherford* v. *Rideout Bank*, 11 Cal.2d 479, at pages 483 and 484 [80 P.2d 978, 117 A.L.R. 383] : "The rule is clearly stated in the Restatement of the Law of Agency, sections 261 and 262.

"Section 261: 'A principal who puts an agent in a position that enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud.'

"The illustrations and the comment found under these two sections are convincing. Under section 261 it is said: 'The

principal is subject to liability under the rule stated in this section although he is entirely innocent, although he has received no benefit from the transaction, and, as stated in section 262, although the agent acts solely for his own purposes. Liability is based upon the fact that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him.'

''The Restatement of the Law of Agency has been generally endorsed by this court in *Speck* v. *Wylie,* 1 Cal.2d 625 [36 P.2d 618, 95 A.L.R. 760], and the particular principles announced in sections 261 and 262 have been applied by this court in *Bank of California* v. *Western Union Tel. Co.,* 52 Cal. 280 (followed in *Pacific Postal Tel. Co.* v. *Bank of Palo Alto,* 109 F. 369 [54 A.L.R. 711]), *Otis Elev. Co.* v. *First Nat. Bank,* 163 Cal. 31 [124 P. 704, 41 L.R.A.N.S. 529], and *National Bank of San Mateo* v. *Whitney,* 181 Cal. 202 [183 P. 789, 8 A.L.R. 298]. See, also, *Blair* v. *Guarantee Title Co., Inc.,* 103 Cal.App. 260 [284 P. 719], *Ross* v. *Prudential Guar. Bldg. etc. Assn.,* 140 Cal.App. 148 [35 P.2d 176], *Mitchell Street State Bank* v. *Schaefer,* 169 Wis. 543 [173 N.W. 330], and *National City Bank* v. *Carter,* 14 F.2d 940.''

And in *Wenban Estate, Inc.* v. *Hewlett,* 193 Cal. 675 [227 P. 723], the court said at pages 696-7: ''While it is the general rule that a corporation is an entity separate and distinct from its stockholders, with separate, distinct liabilities and obligations, nevertheless there is a well-recognized and firmly settled exception to this general rule, that, when necessary to redress fraud, protect the rights of third persons, or prevent a palpable injustice, the law and equity will intervene and cast aside the legal fiction of independent corporate existence, as distinguished from those who hold and own the corporate capital stock, and deal with the corporation and stockholders as identical entities with identical duties and obligations.

''Accordingly, it has been held that upon a sufficient showing that a corporation is but the instrumentality through which an individual, who is the sole owner of all of the corporate capital stock, for convenience transacts his business, equity, looking to the substance rather than the form of the relation, and the law as well, will hold such corporation obligated for the acts of the sole owner of the corporation to the same extent and just as he would be bound in the absence of

the existence of the corporation. (*Llewellyn Iron Works* v. *Abbott Kinney Co.*, 172 Cal. 210 [155 P. 986]; *Commercial Security Co.* v. *Modesto Drug Co.*, 43 Cal.App. 162 [184 P. 964]; *Minifie* v. *Rowley*, 187 Cal. 481 [202 P. 673].)"

The next contention of defendant is that the finding that Underwriters was the alter ego of defendant is not supported by the evidence. The finding of the trial court was as follows:

"That it is true that the instrument (stock re-purchase agreement) . . . was executed by the Plaintiffs, whose names it bears, but it is also true that said instrument was a part of a design on behalf of the Defendant, its officers and agents, to mislead the Plaintiffs and obtain from them their Mercantile Building and Loan Association Investment Certificates; that said instrument is signed by the POSTAL UNDERWRITERS, INC., the alter-ego of the POSTAL UNION LIFE INSURANCE COMPANY; that said POSTAL UNDERWRITERS, INC., never legally came into existence, and no steps were taken toward its incorporation, other than the filing of its Articles of Incorporation; no stock was ever issued, no organization meeting was held, it was a corporation in name only; its Vice-President, T. J. OLSEN, was in the employ of and paid by the POSTAL UNION LIFE INSURANCE COMPANY; an employee of the POSTAL UNION LIFE INSURANCE COMPANY received the mail of the POSTAL UNDERWRITERS, INC.; it was organized by B. D. MALONE, the General Manager of the POSTAL UNION LIFE INSURANCE COMPANY, with a name so similar as to mislead the public; its Secretary and bookkeeper was the private secretary to B. D. MALONE, and the Plaintiffs did not know until the year 1936 that the POSTAL UNION LIFE INSURANCE COMPANY and the POSTAL UNDERWRITERS, INC., were not one and the same corporation; that all acts of the POSTAL UNDERWRITERS, INC., were in truth and in fact the acts of the POSTAL UNION LIFE INSURANCE COMPANY; . . ."

In addition to the evidentiary facts stated in the finding just quoted, there is the fact hereinbefore referred to that Underwriters was organized, controlled, used, managed and manipulated to aid in carrying on the business of defendant. No other conclusion can be arrived at from a reading of the entire record in this case. On March 14, 1933, Green, as agent of defendant, took from plaintiffs their building and loan certificates endorsed in blank and gave to plaintiffs the binding receipts. Then on April 14, 1935, after plaintiffs had

sent a telegram to defendant stating that they had not received their policies, Green came to plaintiffs and handed them the stock certificate for 976 shares and the contract to repurchase said stock, already executed by Underwriters, and plaintiffs, not understanding that the contract was signed by Postal Underwriters instead of defendant Postal Union, and relying upon Green's assurance that everything was all right, signed same. It is clear from the record that practically all of the business of Underwriters was in connection with the business of defendant and it is very significant that on December 18, 1935, just 19 days after Malone ceased to be general manager of defendant, the minutes of defendant corporation show that all of the obligations of Underwriters to defendant were released in consideration of the transfer to defendant by Underwriters of various properties on which defendant held encumbrances, from which transaction taken along with evidence throughout the entire record, it may fairly be inferred that defendant no longer desired to make use of Underwriters and took back its remaining assets into defendant corporation.

Plaintiffs suggest that we may find additional support for the finding that Underwriters was the alter ego of defendant in the case of *Marr* v. *Postal Union Life Ins. Co.* (defendant and appellant here), 40 Cal.App.2d 673 [105 P.2d 649], in which case the plaintiff was successful in establishing the liability of the defendant upon a promissory note executed by this same Postal Underwriters, Inc., in which the District Court of Appeal in upholding the finding of the trial court that Postal Underwriters, Inc., was the alter ego of defendant Postal Union Life Insurance Company, said at page 685: "The foregoing recital of the evidence convinces us that there were here present all the necessary elements to constitute an *alter ego* relationship between the two corporations, namely, (1) control of one by the other; (2) that one was but the mere conduit of the business of the other; (3) that recognition of the separate existence of the Underwriters would sanction a fraud and permit oppression and injustice. We entertain no doubt that the evidence clearly shows that the Underwriters had no real genuine interest in the Royal Palms property; that all it possessed was the naked legal title, held by it for the insurance company. (*Shea* v. *Leonis*, 14 Cal.2d 666 [96 P.2d 332]; *Clark* v. *Millsap, supra* [197 Cal. 765 (242 P. 918)]; *Higgins* v. *California Petroleum etc. Co., supra,* [122 Cal. 373] 376 [55 P. 155]; *Lost Burros Gold Min. Co.* v. *Inyo*

*County Bank,* 83 Cal.App. 679 [257 P. 209].) The jury was the judge of the value and effect of evidence challenging the verity of the testimony here narrated.'' A hearing was denied by the Supreme Court. However, in the Marr case, there were different parties plaintiff and a different record, and the finding therein that Underwriters was the alter ego of defendant cannot be considered as res judicata in this case. However, the rules of law enunciated by that court in that case are sound. At pages 681-2 it is stated: ''Before the courts will disregard the corporate entity of one corporation and treat it as the *alter ego* of another, even though the latter may own all the stock of the former, it must further appear that there is such a unity of interest and ownership that the individuality of the one corporation and the owner or owners of its stock has ceased, and further, that the observance of the fiction of separate existence would under the circumstances sanction a fraud or promote injustice. In other words, bad faith in one form or another must be shown before the court may disregard the fiction of separate corporate existence. (*Hollywood Cleaning & Pressing Co.* v. *Hollywood Laundry Service,* 217 Cal. 124 [17 P.2d 709]; *Erkenbrecher* v. *Grant,* 187 Cal. 7 [200 P. 641]; *Stanford Hotel Co.* v. *M. Schwind Co.,* 180 Cal. 348 [181 P. 780]; *Sunset Farms, Inc.,* v. *Superior Court,* 9 Cal.App.2d 389 [50 P.2d 106].) ''

Taking all of the evidence in the instant case, and all of the inferences that may reasonably be drawn therefrom, we do not believe that the finding of the trial court in this regard lacks substantial support in the record.

Defendant contends also that the findings that defendant defrauded plaintiffs are without support in the record. But, as defendant points out, the findings make it quite clear that judgment was awarded to plaintiffs on contracts which are the ''binding receipts.'' It is unnecessary, therefore, to discuss this contention, as the arguments made in its support are a repetition of arguments previously made by defendant, which are covered by what we have hereinbefore said. In the same category is the contention of defendant that fraud on the part of defendant was not pleaded and all findings relative thereto are improper. It is clear that the action was based upon the contracts which were the binding receipts and despite the fact that defendant and its agents were guilty of fraudulent acts in connection with the contracts, the action was still based upon contract. The findings as to fraud

merely explained the manner in which the transaction upon which the action was based was carried out.

Defendant complains also that the finding that plaintiffs had little education is without support in the record. However, we believe that a trial judge who has an opportunity of observing and hearing a witness upon the stand for as many hours as plaintiffs were upon the witness stand in this case, is fully qualified to make such a finding.

Defendant also contends that the trial court committed material error in refusing to permit defendant to cross-examine Green regarding his conversations with plaintiffs. The extent of the cross-examination of a witness is a matter largely within the sound discretion of the trial judge. In this case Green was a witness called by plaintiffs, but, in view of all the circumstances and of Green's former connection with defendant, plaintiffs were fully justified in limiting their direct examination to the instructions given Green by Malone and Bouer. Plaintiffs did not question Green as to his conversations with plaintiffs upon the direct examination of said witness and we perceive no error on the part of the trial court in refusing to allow defendant to go into said conversations upon cross-examination. Furthermore, there was nothing to prevent defendant from calling Green as its own witness and asking him as to such conversations, but it evidently chose not to do so.

Defendant also contends: "The finding that Green, Bouer and Malone were convicted on fifteen charges of grand theft in fifteen transactions identical in form (with the transaction with plaintiffs) is not supported by the evidence." However, we do not see how defendant can complain of this finding, as we find that the language of the court's finding is exactly the same as the language set forth in the affirmative defense in defendant's answer, the defendant having there alleged: "That the said H. B. Green, F. J. Bouer and B. D. Malone, were indicted, tried and convicted of fifteen charges of Grand Theft and Embezzlement in fifteen transaction[s] identical in form, involving the purchase of pass-books, in Monterey County, and the said Green, F. J. Bouer and B. D. Malone were thereupon sentenced to serve terms in the State Penetentiary at San Quentin as prescribed by the law for said offenses."

We shall not discuss a number of other contentions urged by defendant because they are related to the contentions al-

ready discussed and are covered by what we have heretofore said.

The one remaining contention of defendant necessary to discuss is that the finding that defendant is not entitled to credit for the value of 976 shares of stock received by plaintiffs is erroneous.

Defendant argues that whether Green was acting for Malone and Bouer as individuals or was acting for defendant, plaintiffs should account for everything of value that they received in the transaction and that the amount recovered by them should in any event be diminished by the value of said 976 shares of stock. The evidence and findings on this issue are totally unsatisfactory. Obviously, if plaintiffs received anything of value from defendant or its agents, or if plaintiffs are legally chargeable with the loss of the stock, they should not be permitted to recover double damages. The same law that permits plaintiffs to recover from defendant for the value of their building and loan certificates should enable defendant to receive credit for the value of said stock. As pointed out, however, there is no satisfactory evidence in the record to show what the market value of said 976 shares of stock was on April 14, 1935, the date upon which plaintiffs received it, and this will require a reversal of the judgment to that extent. In all other respects, however, the judgment should be affirmed.

Defendant in concluding its opening brief asserts that if this judgment is permitted to stand, the procedures now in use for soliciting applications for insurance must be entirely revised for the protection of insurance companies and expresses grave concern as to the effect of such a decision upon insurance companies generally. Defendant states that it is difficult to see how insurance companies can devise better methods to protect themselves and the persons with whom their agents deal than the printed forms which warn as to the limits of the agent's authority. We do not believe that the affirmance in its general aspects of the judgment will interfere with the proper and legitimate conduct of the business of any company. The limitations upon the power of an agent are well understood and nothing that we have said herein is intended to change those limitations. The difficulty with defendant's position is that it refuses to accept the fact that the record here justifies the decision and findings of the learned trial judge that Malone dominated and controlled

the affairs of defendant corporation and was in fact the corporation during the time of the transaction in question, and that the agent, Green, was acting under his instructions. There is here no question of an agent acting without authority or contrary to the instructions of the principal. Under the facts of this case, as shown by the record, the law would indeed be impotent if plaintiffs should be denied relief.

In view of the foregoing the judgment is reversed with directions to the trial court to take evidence and to ascertain the true facts in reference to the 976 shares of stock, and if it should find that plaintiffs are legally chargeable with the value of the stock, then to ascertain the value of the 976 shares of stock on April 14, 1935, and deduct with interest said amount from the value of the plaintiffs' building and loan certificates as found by the court. In all other respects the judgment is affirmed, the parties to bear their own costs on appeal. The order denying defendant's motion for a new trial, being nonappealable, is hereby dismissed.

Peters, P. J., and Ward, J., concurred.

A petition for a rehearing was denied August 31, 1946, and appellant's petition for a hearing by the Supreme Court was denied September 19, 1946.